## NATIONAL ENDOWMENT FOR THE ARTS ET AL.
## v. FINLEY ET AL.

No. 97–371.   Argued March 31, 1998—Decided June 25, 1998

570

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, and BREYER, JJ., joined, and in all but Part II–B of which GINSBURG, J., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 590. SOUTER, J., filed a dissenting opinion, *post*, p. 600.

*Solicitor General Waxman* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Deputy Assistant Attorney General Preston, Jeffrey P. Minear, William Kanter, Alfred Mollin,* and *Karen Christensen.*

*David Cole* argued the cause for respondents. With him on the briefs were *Ellen Yaroshefsky, Marjorie Heins, Steven R. Shapiro, Mary D. Dorman,* and *Carol Sobel.**

JUSTICE O'CONNOR delivered the opinion of the Court.†

The National Foundation on the Arts and the Humanities Act of 1965, as amended in 1990, 104 Stat. 1963, requires the Chairperson of the National Endowment for the Arts (NEA) to ensure that "artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U. S. C. § 954(d)(1). In this case, we review the Court of Ap-

---

*Briefs of *amici curiae* urging reversal were filed for the American Center for Law and Justice by *Jay A. Sekulow, Colby M. May, James M. Henderson, Sr.,* and *John P. Tuskey;* for Liberty Counsel by *Mathew D. Staver* and *Frederick H. Nelson;* and for the National Family Legal Foundation by *Len L. Munsil.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of University Professors et al. by *John Joshua Wheeler, Jonathan R. Alger,* and *Jeffrey P. Cunard;* for Americans United for Separation of Church and State by *Steven K. Green, Julie A. Segal,* and *Edward Tabash;* for the Family Research Institute of Wisconsin by *Daniel Kelly;* for the New School for Social Research et al. by *Floyd Abrams, Burt Neuborne, Kathleen M. Sullivan, Jonathan Sherman, Elai Katz,* and *Deborah Goldberg;* for the Rockefeller Foundation by *Donald B. Verrilli, Jr.;* for Twenty-Six Arts, Broadcast, Library, Museum and Publishing *Amici Curiae* by *James F. Fitzpatrick, James A. Dobkin, Matthew T. Heartney, Mark R. Drozdowski, Elliot M. Mincberg,* and *Lawrence S. Ottinger;* for Volunteer Lawyers for the Arts et al. by *Marci A. Hamilton;* and for Claes Oldenburg et al. by *Gloria C. Phares.*

*Paul J. McGeady* and *Robert W. Peters* filed a brief for Morality in Media, Inc., as *amicus curiae.*

†JUSTICE GINSBURG joins all but Part II–B of this opinion.

peals' determination that § 954(d)(1), on its face, impermissibly discriminates on the basis of viewpoint and is void for vagueness under the First and Fifth Amendments. We conclude that § 954(d)(1) is facially valid, as it neither inherently interferes with First Amendment rights nor violates constitutional vagueness principles.

## I

## A

With the establishment of the NEA in 1965, Congress embarked on a "broadly conceived national policy of support for the . . . arts in the United States," see § 953(b), pledging federal funds to "help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of . . . creative talent." § 951(7). The enabling statute vests the NEA with substantial discretion to award grants; it identifies only the broadest funding priorities, including "artistic and cultural significance, giving emphasis to American creativity and cultural diversity," "professional excellence," and the encouragement of "public knowledge, education, understanding, and appreciation of the arts." See §§ 954(c)(1)–(10).

Applications for NEA funding are initially reviewed by advisory panels composed of experts in the relevant field of the arts. Under the 1990 amendments to the enabling statute, those panels must reflect "diverse artistic and cultural points of view" and include "wide geographic, ethnic, and minority representation," as well as "lay individuals who are knowledgeable about the arts." §§ 959(c)(1)–(2). The panels report to the 26-member National Council on the Arts (Council), which, in turn, advises the NEA Chairperson. The Chairperson has the ultimate authority to award grants but may not approve an application as to which the Council has made a negative recommendation. § 955(f).

Since 1965, the NEA has distributed over $3 billion in grants to individuals and organizations, funding that has served as a catalyst for increased state, corporate, and foundation support for the arts. Congress has recently restricted the availability of federal funding for individual artists, confining grants primarily to qualifying organizations and state arts agencies, and constraining subgranting. See Department of the Interior and Related Agencies Appropriations Act, 1998, § 329, 111 Stat. 1600. By far the largest portion of the grants distributed in fiscal year 1998 were awarded directly to state arts agencies. In the remaining categories, the most substantial grants were allocated to symphony orchestras, fine arts museums, dance theater foundations, and opera associations. See National Endowment for the Arts, FY 1998 Grants, Creation & Presentation 5–8, 21, 20, 27.

Throughout the NEA's history, only a handful of the agency's roughly 100,000 awards have generated formal complaints about misapplied funds or abuse of the public's trust. Two provocative works, however, prompted public controversy in 1989 and led to congressional revaluation of the NEA's funding priorities and efforts to increase oversight of its grant-making procedures. The Institute of Contemporary Art at the University of Pennsylvania had used $30,000 of a visual arts grant it received from the NEA to fund a 1989 retrospective of photographer Robert Mapplethorpe's work. The exhibit, entitled The Perfect Moment, included homoerotic photographs that several Members of Congress condemned as pornographic. See, e. g., 135 Cong. Rec. 22372 (1989). Members also denounced artist Andres Serrano's work Piss Christ, a photograph of a crucifix immersed in urine. See, e. g., id., at 9789. Serrano had been awarded a $15,000 grant from the Southeast Center for Contemporary Art, an organization that received NEA support.

When considering the NEA's appropriations for fiscal year 1990, Congress reacted to the controversy surrounding the

Mapplethorpe and Serrano photographs by eliminating $45,000 from the agency's budget, the precise amount contributed to the two exhibits by NEA grant recipients.   Congress also enacted an amendment providing that no NEA funds "may be used to promote, disseminate, or produce materials which in the judgment of [the NEA] may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political, or scientific value."   Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 738–742. The NEA implemented Congress' mandate by instituting a requirement that all grantees certify in writing that they would not utilize federal funding to engage in projects inconsistent with the criteria in the 1990 appropriations bill. That certification requirement was subsequently invalidated as unconstitutionally vague by a Federal District Court, see *Bella Lewitzky Dance Foundation* v. *Frohnmayer*, 754 F. Supp. 774 (CD Cal. 1991), and the NEA did not appeal the decision.

In the 1990 appropriations bill, Congress also agreed to create an Independent Commission of constitutional law scholars to review the NEA's grant-making procedures and assess the possibility of more focused standards for public arts funding.   The Commission's report, issued in September 1990, concluded that there is no constitutional obligation to provide arts funding, but also recommended that the NEA rescind the certification requirement and cautioned against legislation setting forth any content restrictions.   Instead, the Commission suggested procedural changes to enhance the role of advisory panels and a statutory reaffirmation of "the high place the nation accords to the fostering of mutual respect for the disparate beliefs and values among us."   See Independent Commission, Report to Congress on the Na-

576

tional Endowment for the Arts 83–91 (Sept. 1990), 3 Record, Doc. No. 51, Exh. K (hereinafter Report to Congress).

Informed by the Commission's recommendations, and cognizant of pending judicial challenges to the funding limitations in the 1990 appropriations bill, Congress debated several proposals to reform the NEA's grant-making process when it considered the agency's reauthorization in the fall of 1990. The House rejected the Crane Amendment, which would have virtually eliminated the NEA, see 136 Cong. Rec. 28656–28657 (1990), and the Rohrabacher Amendment, which would have introduced a prohibition on awarding any grants that could be used to "promote, distribute, disseminate, or produce matter that has the purpose or effect of denigrating the beliefs, tenets, or objects of a particular religion" or "of denigrating an individual, or group of individuals, on the basis of race, sex, handicap, or national origin," *id.*, at 28657–28664. Ultimately, Congress adopted the Williams/Coleman Amendment, a bipartisan compromise between Members opposing any funding restrictions and those favoring some guidance to the agency. In relevant part, the Amendment became § 954(d)(1), which directs the Chairperson, in establishing procedures to judge the artistic merit of grant applications, to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *

---

*Title 20 U. S. C. § 954(d) provides in full that:

"No payment shall be made under this section except upon application therefor which is submitted to the National Endowment for the Arts in accordance with regulations issued and procedures established by the Chairperson. In establishing such regulations and procedures, the Chairperson shall ensure that—

"(1) artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public; and

"(2) applications are consistent with the purposes of this section. Such regulations and procedures shall clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded."

The NEA has not promulgated any official interpretation of the provision, but in December 1990, the Council unanimously adopted a resolution to implement § 954(d)(1) merely by ensuring that the members of the advisory panels that conduct the initial review of grant applications represent geographic, ethnic, and esthetic diversity. See Minutes of the Dec. 1990 Retreat of the National Council on the Arts, reprinted in App. 12–13; Transcript of the Dec. 1990 Retreat of the National Council on the Arts, reprinted in *id.*, at 32–33. John Frohnmayer, then Chairperson of the NEA, also declared that he would "count on [the] procedures" ensuring diverse membership on the peer review panels to fulfill Congress' mandate. See *id.*, at 40.

B

The four individual respondents in this case, Karen Finley, John Fleck, Holly Hughes, and Tim Miller, are performance artists who applied for NEA grants before § 954(d)(1) was enacted. An advisory panel recommended approval of respondents' projects, both initially and after receiving Frohnmayer's request to reconsider three of the applications. A majority of the Council subsequently recommended disapproval, and in June 1990, the NEA informed respondents that they had been denied funding. Respondents filed suit, alleging that the NEA had violated their First Amendment rights by rejecting the applications on political grounds, had failed to follow statutory procedures by basing the denial on criteria other than those set forth in the NEA's enabling statute, and had breached the confidentiality of their grant applications through the release of quotations to the press, in violation of the Privacy Act of 1974, 5 U. S. C. § 552(a). Respondents sought restoration of the recommended grants or reconsideration of their applications, as well as damages for the alleged Privacy Act violations. When Congress enacted § 954(d)(1), respondents, now joined by the National Association of Artists' Organizations (NAAO), amended

their complaint to challenge the provision as void for vagueness and impermissibly viewpoint based. First Amended Complaint ¶ 1.

The District Court denied the NEA's motion for judgment on the pleadings, 795 F. Supp. 1457, 1463–1468 (CD Cal. 1992), and, after discovery, the NEA agreed to settle the individual respondents' statutory and as-applied constitutional claims by paying the artists the amount of the vetoed grants, damages, and attorney's fees. See Stipulation and Settlement Agreement, 6 Record, Doc. No. 128, pp. 3–5.

The District Court then granted summary judgment in favor of respondents on their facial constitutional challenge to § 954(d)(1) and enjoined enforcement of the provision. See 795 F. Supp., at 1476. The court rejected the argument that the NEA could comply with § 954(d)(1) by structuring the grant selection process to provide for diverse advisory panels. *Id.*, at 1471. The provision, the court stated, "fails adequately to notify applicants of what is required of them or to circumscribe NEA discretion." *Id.*, at 1472. Reasoning that "the very nature of our pluralistic society is that there are an infinite number of values and beliefs, and correlatively, there may be no national 'general standards of decency,'" the court concluded that § 954(d)(1) "cannot be given effect consistent with the Fifth Amendment's due process requirement." *Id.*, at 1471–1472 (citing *Grayned* v. *City of Rockford,* 408 U. S. 104, 108–109 (1972)). Drawing an analogy between arts funding and public universities, the court further ruled that the First Amendment constrains the NEA's grant-making process, and that because § 954(d)(1) "clearly reaches a substantial amount of protected speech," it is impermissibly overbroad on its face. 795 F. Supp., at 1476. The Government did not seek a stay of the District Court's injunction, and consequently the NEA has not applied § 954(d)(1) since June 1992.

A divided panel of the Court of Appeals affirmed the District Court's ruling. 100 F. 3d 671 (CA9 1996). The major-

ity agreed with the District Court that the NEA was compelled by the adoption of § 954(d)(1) to alter its grant-making procedures to ensure that applications are judged according to the "decency and respect" criteria. The Chairperson, the court reasoned, "has no discretion to ignore this obligation, enforce only part of it, or give it a cramped construction." *Id.*, at 680. Concluding that the "decency and respect" criteria are not "susceptible to objective definition," the court held that § 954(d)(1) "gives rise to the danger of arbitrary and discriminatory application" and is void for vagueness under the First and Fifth Amendments. *Id.*, at 680–681. In the alternative, the court ruled that § 954(d)(1) violates the First Amendment's prohibition on viewpoint-based restrictions on protected speech. Government funding of the arts, the court explained, is both a "traditional sphere of free expression," *Rust* v. *Sullivan*, 500 U. S. 173, 200 (1991), and an area in which the Government has stated its intention to "encourage a diversity of views from private speakers," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 834 (1995). 100 F. 3d, at 681–682. Accordingly, finding that § 954(d)(1) "has a speech-based restriction as its sole rationale and operative principle," *Rosenberger, supra*, at 834, and noting the NEA's failure to articulate a compelling interest for the provision, the court declared it facially invalid. 100 F. 3d, at 683.

The dissent asserted that the First Amendment protects artists' rights to express themselves as indecently and disrespectfully as they like, but does not compel the Government to fund that speech. *Id.*, at 684 (opinion of Kleinfeld, J.). The challenged provision, the dissent contended, did not prohibit the NEA from funding indecent or offensive art, but merely required the agency to consider the "decency and respect" criteria in the grant selection process. *Id.*, at 689–690. Moreover, according to the dissent's reasoning, the vagueness principles applicable to the direct regulation of speech have no bearing on the selective award of prizes, and

the Government may draw distinctions based on content and viewpoint in making its funding decisions. *Id.*, at 684–688. Three judges dissented from the denial of rehearing en banc, maintaining that the panel's decision gave the statute an "implausible construction," applied the "'void for vagueness' doctrine where it does not belong," and extended "First Amendment principles to a situation that the First Amendment doesn't cover." 112 F. 3d 1015, 1016–1017 (CA9 1997).

We granted certiorari, 522 U. S. 991 (1997), and now reverse the judgment of the Court of Appeals.

## II

### A

Respondents raise a facial constitutional challenge to § 954(d)(1), and consequently they confront "a heavy burden" in advancing their claim. *Rust, supra,* at 183. Facial invalidation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973); see also *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 223 (1990) (noting that "facial challenges to legislation are generally disfavored"). To prevail, respondents must demonstrate a substantial risk that application of the provision will lead to the suppression of speech. See *Broadrick, supra,* at 615.

Respondents argue that the provision is a paradigmatic example of viewpoint discrimination because it rejects any artistic speech that either fails to respect mainstream values or offends standards of decency. The premise of respondents' claim is that § 954(d)(1) constrains the agency's ability to fund certain categories of artistic expression. The NEA, however, reads the provision as merely hortatory, and contends that it stops well short of an absolute restriction. Section 954(d)(1) adds "considerations" to the grant-making process; it does not preclude awards to projects that might be deemed "indecent" or "disrespectful," nor place conditions on grants, or even specify that those factors must be given

any particular weight in reviewing an application. Indeed, the agency asserts that it has adequately implemented § 954(d)(1) merely by ensuring the representation of various backgrounds and points of view on the advisory panels that analyze grant applications. See Declaration of Randolph McAusland, Deputy Chairman for Programs at the NEA, reprinted in App. 79 (stating that the NEA implements the provision "by ensuring that the peer review panels represent a variety of geographical areas, aesthetic views, professions, areas of expertise, races and ethnic groups, and gender, and include a lay person"). We do not decide whether the NEA's view—that the formulation of diverse advisory panels is sufficient to comply with Congress' command—is in fact a reasonable reading of the statute. It is clear, however, that the text of § 954(d)(1) imposes no categorical requirement. The advisory language stands in sharp contrast to congressional efforts to prohibit the funding of certain classes of speech. When Congress has in fact intended to affirmatively constrain the NEA's grant-making authority, it has done so in no uncertain terms. See § 954(d)(2) ("[O]bscenity is without artistic merit, is not protected speech, and shall not be funded").

Furthermore, like the plain language of § 954(d), the political context surrounding the adoption of the "decency and respect" clause is inconsistent with respondents' assertion that the provision compels the NEA to deny funding on the basis of viewpoint discriminatory criteria. The legislation was a bipartisan proposal introduced as a counterweight to amendments aimed at eliminating the NEA's funding or substantially constraining its grant-making authority. See, e. g., 136 Cong. Rec. 28626, 28632, 28634 (1990). The Independent Commission had cautioned Congress against the adoption of distinct viewpoint-based standards for funding, and the Commission's report suggests that "additional criteria for selection, if any, should be incorporated as part of the selection process (perhaps as part of a definition of 'artistic excel-

lence'), rather than isolated and treated as exogenous considerations." Report to Congress 89. In keeping with that recommendation, the criteria in § 954(d)(1) inform the assessment of artistic merit, but Congress declined to disallow any particular viewpoints. As the sponsors of § 954(d)(1) noted in urging rejection of the Rohrabacher Amendment: "[I]f we start down that road of prohibiting categories of expression, categories which are indeed constitutionally protected speech, where do we end? Where one Member's aversions end, others with different sensibilities and with different values begin." 136 Cong. Rec. 28624 (statement of Rep. Coleman); see also *id.*, at 28663 (statement of Rep. Williams) (arguing that the Rohrabacher Amendment would prevent the funding of Jasper Johns' flag series, The Merchant of Venice, Chorus Line, Birth of a Nation, and the Grapes of Wrath). In contrast, before the vote on § 954(d)(1), one of its sponsors stated: "If we have done one important thing in this amendment, it is this. We have maintained the integrity of freedom of expression in the United States." *Id.*, at 28674.

That § 954(d)(1) admonishes the NEA merely to take "decency and respect" into consideration and that the legislation was aimed at reforming procedures rather than precluding speech undercut respondents' argument that the provision inevitably will be utilized as a tool for invidious viewpoint discrimination. In cases where we have struck down legislation as facially unconstitutional, the dangers were both more evident and more substantial. In *R. A. V. v. St. Paul,* 505 U. S. 377 (1992), for example, we invalidated on its face a municipal ordinance that defined as a criminal offense the placement of a symbol on public or private property "'which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender.'" See *id.*, at 380. That provision set forth a clear penalty, proscribed views on particular "disfavored subjects," *id.*, at 391, and suppressed "distinctive idea[s], conveyed by a distinctive message," *id.*, at 393.

In contrast, the "decency and respect" criteria do not silence speakers by expressly "threaten[ing] censorship of ideas." See *ibid.* Thus, we do not perceive a realistic danger that § 954(d)(1) will compromise First Amendment values. As respondents' own arguments demonstrate, the considerations that the provision introduces, by their nature, do not engender the kind of directed viewpoint discrimination that would prompt this Court to invalidate a statute on its face. Respondents assert, for example, that "[o]ne would be hard-pressed to find two people in the United States who could agree on what the 'diverse beliefs and values of the American public' are, much less on whether a particular work of art 'respects' them"; and they claim that " '[d]ecency' is likely to mean something very different to a septegenarian in Tuscaloosa and a teenager in Las Vegas." Brief for Respondents 41. The NEA likewise views the considerations enumerated in § 954(d)(1) as susceptible to multiple interpretations. See Department of the Interior and Related Agencies Appropriations for 1992, Hearing before the Subcommittee on Interior and Related Agencies of the House Committee on Appropriations, 102d Cong., 1st Sess., 234 (1991) (testimony of John Frohnmayer) ("[N]o one individual is wise enough to be able to consider general standards of decency and the diverse values and beliefs of the American people all by him or herself. These are group decisions"). Accordingly, the provision does not introduce considerations that, in practice, would effectively preclude or punish the expression of particular views. Indeed, one could hardly anticipate how "decency" or "respect" would bear on grant applications in categories such as funding for symphony orchestras.

Respondents' claim that the provision is facially unconstitutional may be reduced to the argument that the criteria in § 954(d)(1) are sufficiently subjective that the agency could utilize them to engage in viewpoint discrimination. Given the varied interpretations of the criteria and the vague ex-

hortation to "take them into consideration," it seems unlikely that this provision will introduce any greater element of selectivity than the determination of "artistic excellence" itself. And we are reluctant, in any event, to invalidate legislation "on the basis of its hypothetical application to situations not before the Court." *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 743 (1978).

The NEA's enabling statute contemplates a number of indisputably constitutional applications for both the "decency" prong of § 954(d)(1) and its reference to "respect for the diverse beliefs and values of the American public." Educational programs are central to the NEA's mission. See § 951(9) ("Americans should receive in school, background and preparation in the arts and humanities"); § 954(c)(5) (listing "projects and productions that will encourage public knowledge, education, understanding, and appreciation of the arts" among the NEA's funding priorities); National Endowment for the Arts, FY 1999 Application Guidelines 18–19 (describing "Education & Access" category); Brief for Twenty-six Arts, Broadcast, Library, Museum and Publishing *Amici Curiae* 5, n. 2 (citing NEA Strategic Plan FY 1997–FY 2002, which identifies children's festivals and museums, art education, at-risk youth projects, and artists in schools as examples of the NEA's activities). And it is well established that "decency" is a permissible factor where "educational suitability" motivates its consideration. *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U. S. 853, 871 (1982); see also *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 683 (1986) ("Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse").

Permissible applications of the mandate to consider "respect for the diverse beliefs and values of the American public" are also apparent. In setting forth the purposes of the NEA, Congress explained that "[i]t is vital to a democracy to honor and preserve its multicultural artistic heritage."

§ 951(10). The agency expressly takes diversity into account, giving special consideration to "projects and productions . . . that reach, or reflect the culture of, a minority, inner city, rural, or tribal community," § 954(c)(4), as well as projects that generally emphasize "cultural diversity," § 954(c)(1). Respondents do not contend that the criteria in § 954(d)(1) are impermissibly applied when they may be justified, as the statute contemplates, with respect to a project's intended audience.

We recognize, of course, that reference to these permissible applications would not alone be sufficient to sustain the statute against respondents' First Amendment challenge. But neither are we persuaded that, in other applications, the language of § 954(d)(1) itself will give rise to the suppression of protected expression. Any content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding. The NEA has limited resources, and it must deny the majority of the grant applications that it receives, including many that propose "artistically excellent" projects. The agency may decide to fund particular projects for a wide variety of reasons, "such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form." Brief for Petitioners 32. As the dissent below noted, it would be "impossible to have a highly selective grant program without denying money to a large amount of constitutionally protected expression." 100 F. 3d, at 685 (opinion of Kleinfeld, J.). The "very assumption" of the NEA is that grants will be awarded according to the "artistic worth of competing applicants," and absolute neutrality is simply "inconceivable." *Advo-*

*cates for the Arts* v. *Thomson*, 532 F. 2d 792, 795–796 (CA1), cert. denied, 429 U. S. 894 (1976).

Respondents' reliance on our decision in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), is therefore misplaced. In *Rosenberger*, a public university declined to authorize disbursements from its Student Activities Fund to finance the printing of a Christian student newspaper. We held that by subsidizing the Student Activities Fund, the University had created a limited public forum, from which it impermissibly excluded all publications with religious editorial viewpoints. *Id.*, at 837. Although the scarcity of NEA funding does not distinguish this case from *Rosenberger*, see *id.*, at 835, the competitive process according to which the grants are allocated does. In the context of arts funding, in contrast to many other subsidies, the Government does not indiscriminately "encourage a diversity of views from private speakers," *id.*, at 834. The NEA's mandate is to make esthetic judgments, and the inherently content-based "excellence" threshold for NEA support sets it apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations that were "'related to the educational purpose of the University,'" *id.*, at 824—and from comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater, see *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 386 (1993); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555 (1975), or the second class mailing privileges available to "'all newspapers and other periodical publications,'" see *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 148, n. 1 (1946).

Respondents do not allege discrimination in any particular funding decision. (In fact, after filing suit to challenge § 954(d)(1), two of the individual respondents received NEA grants. See 4 Record, Doc. No. 57, Exh. 35 (Sept. 30, 1991, letters from the NEA informing respondents Hughes and Miller that they had been awarded Solo Performance The-

ater Artist Fellowships).) Thus, we have no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas," *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 550 (1983) (internal quotation marks omitted), and if a subsidy were "manipulated" to have a "coercive effect," then relief could be appropriate. See *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 237 (1987) (SCALIA, J., dissenting); see also *Leathers* v. *Medlock*, 499 U. S. 439, 447 (1991) ("[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints"). In addition, as the NEA itself concedes, a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive "certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991); see Brief for Petitioners 38, n. 12. Unless § 954(d)(1) is applied in a manner that raises concern about the suppression of disfavored viewpoints, however, we uphold the constitutionality of the provision. Cf. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 396 (1969) ("[W]e will not now pass upon the constitutionality of these regulations by envisioning the most extreme applications conceivable, but will deal with those problems if and when they arise" (citation omitted)).

B

Finally, although the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria

that would be impermissible were direct regulation of speech or a criminal penalty at stake. So long as legislation does not infringe on other constitutionally protected rights, Congress has wide latitude to set spending priorities. See *Regan, supra,* at 549. In the 1990 amendments that incorporated § 954(d)(1), Congress modified the declaration of purpose in the NEA's enabling Act to provide that arts funding should "contribute to public support and confidence in the use of taxpayer funds," and that "[p]ublic funds . . . must ultimately serve public purposes the Congress defines." § 951(5). And as we held in *Rust,* Congress may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." 500 U. S., at 193. In doing so, "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Ibid.;* see also *Maher* v. *Roe,* 432 U. S. 464, 475 (1977) ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy").

## III

The lower courts also erred in invalidating § 954(d)(1) as unconstitutionally vague. Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards. See *NAACP* v. *Button,* 371 U. S. 415, 432–433 (1963). The terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns. It is unlikely, however, that speakers will be compelled to steer too far clear of any "forbidden area" in the context of grants of this nature. Cf. *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.,* 482 U. S. 569, 574 (1987) (facially invalidating a flat ban

on any "First Amendment" activities in an airport); *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 499 (1982) ("prohibitory and stigmatizing effect" of a "quasi-criminal" ordinance relevant to the vagueness analysis); *Grayned* v. *City of Rockford*, 408 U. S., at 108 (requiring clear lines between "lawful and unlawful" conduct). We recognize, as a practical matter, that artists may conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding. See Statement of Charlotte Murphy, Executive Director of NAAO, reprinted in App. 21–22. But when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe.

In the context of selective subsidies, it is not always feasible for Congress to legislate with clarity. Indeed, if this statute is unconstitutionally vague, then so too are all Government programs awarding scholarships and grants on the basis of subjective criteria such as "excellence." See, *e. g.*, 2 U. S. C. § 802 (establishing the Congressional Award Program to "promote initiative, achievement, and excellence among youths in the areas of public service, personal development, and physical and expedition fitness"); 20 U. S. C. § 956(c)(1) (providing funding to the National Endowment for the Humanities to promote "progress and scholarship in the humanities"); § 1134h(a) (authorizing the Secretary of Education to award fellowships to "students of superior ability selected on the basis of demonstrated achievement and exceptional promise"); 22 U. S. C. § 2452(a) (authorizing the award of Fulbright grants to "strengthen international cooperative relations"); 42 U. S. C. § 7382c (authorizing the Secretary of Energy to recognize teachers for "excellence in mathematics or science education"). To accept respondents' vagueness argument would be to call into question the constitutionality of these valuable Government programs and countless others like them.

Section 954(d)(1) merely adds some imprecise considerations to an already subjective selection process. It does not, on its face, impermissibly infringe on First or Fifth Amendment rights. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

"The operation was a success, but the patient died." What such a procedure is to medicine, the Court's opinion in this case is to law. It sustains the constitutionality of 20 U. S. C. § 954(d)(1) by gutting it. The most avid congressional opponents of the provision could not have asked for more. I write separately because, unlike the Court, I think that § 954(d)(1) must be evaluated as written, rather than as distorted by the agency it was meant to control. By its terms, it establishes content- and viewpoint-based criteria upon which grant applications are to be evaluated. And that is perfectly constitutional.

I

THE STATUTE MEANS WHAT IT SAYS

Section 954(d)(1) provides:

"No payment shall be made under this section except upon application therefor which is submitted to the National Endowment for the Arts in accordance with regulations issued and procedures established by the Chairperson. In establishing such regulations and procedures, the Chairperson shall ensure that—

"(1) artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."

The phrase "taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public" is what my grammar-school teacher would have condemned as a dangling modifier: There is no noun to which the participle is attached (unless one jumps out of paragraph (1) to press "Chairperson" into service). Even so, it is clear enough that the phrase is meant to apply to those who do the judging. The application reviewers must take into account "general standards of decency" and "respect for the diverse beliefs and values of the American public" when evaluating artistic excellence and merit. One can regard this as either suggesting that decency and respect are elements of what Congress regards as artistic excellence and merit, or as suggesting that decency and respect are factors to be taken into account *in addition to* artistic excellence and merit. But either way, it is entirely, 100% clear that decency and respect are to be taken into account in evaluating applications.

This is so apparent that I am at a loss to understand what the Court has in mind (other than the gutting of the statute) when it speculates that the statute is merely "advisory." *Ante*, at 581. General standards of decency and respect for Americans' beliefs and values *must* (for the statute says that the Chairperson "shall ensure" this result) be taken into account, see, *e. g.*, American Heritage Dictionary 402 (3d ed. 1992) ("consider . . . [t]o take into account; bear in mind"), in evaluating all applications. This does not mean that those factors must always be dispositive, but it *does* mean that they must always be considered. The method of compliance proposed by the National Endowment for the Arts (NEA)—selecting diverse review panels of artists and nonartists that reflect a wide range of geographic and cultural perspectives—is so obviously inadequate that it insults the intelligence. A diverse panel membership increases the odds that, *if and when* the panel takes the factors into account, it will reach an accurate assessment of what they demand. But it

in no way increases the odds that the panel *will* take the factors into consideration—much less *ensures* that the panel will do so, which is the Chairperson's duty under the statute. Moreover, the NEA's fanciful reading of § 954(d)(1) would make it wholly superfluous. Section 959(c) already requires the Chairperson to "issue regulations and establish procedures . . . to ensure that all panels are composed, to the extent practicable, of individuals reflecting . . . diverse artistic and cultural points of view."

The statute requires the decency and respect factors to be considered in evaluating *all* applications—not, for example, just those applications relating to educational programs, *ante,* at 584, or intended for a particular audience, *ante,* at 585. Just as it would violate the statute to apply the artistic excellence and merit requirements to only select categories of applications, it would violate the statute to apply the decency and respect factors less than universally. A reviewer may, of course, give varying weight to the factors depending on the context, and in some categories of cases (such as the Court's example of funding for symphony orchestras, *ante,* at 583) the factors may rarely if ever affect the outcome; but § 954(d)(1) requires the factors to be considered in every case.

I agree with the Court that § 954(d)(1) "imposes no categorical requirement," *ante,* at 581, in the sense that it does not require the denial of all applications that violate general standards of decency or exhibit disrespect for the diverse beliefs and values of Americans. Cf. § 954(d)(2) ("[O]bscenity . . . shall not be funded"). But the factors need not be conclusive to be discriminatory. To the extent a particular applicant exhibits disrespect for the diverse beliefs and values of the American public or fails to comport with general standards of decency, the likelihood that he will receive a grant diminishes. In other words, the presence of the "tak[e] into consideration" clause "cannot be regarded as mere surplusage; it means something," *Potter* v. *United*

*States,* 155 U. S. 438, 446 (1894). And the "something" is that the decisionmaker, all else being equal, will favor applications that display decency and respect, and disfavor applications that do not.

This unquestionably constitutes viewpoint discrimination.[1] That conclusion is not altered by the fact that the statute does not "compe[l]" the denial of funding, *ante,* at 581, any more than a provision imposing a five-point handicap on all black applicants for civil service jobs is saved from being race discrimination by the fact that it does not compel the rejection of black applicants. If viewpoint discrimination in this context is unconstitutional (a point I shall address anon), the law is invalid unless there are some situations in which the decency and respect factors *do not constitute viewpoint discrimination.* And there is none. The applicant who displays "decency," that is, "[c]onformity to prevailing standards of propriety or modesty," American Heritage Dictionary, at 483 (def. 2), and the applicant who displays "respect," that is, "deferential regard," for the diverse beliefs and values of the American people, *id.,* at 1536 (def. 1), will *always* have an edge over an applicant who displays the opposite. And finally, the conclusion of viewpoint discrimination is not affected by the fact that what constitutes " 'decency' " or " 'the diverse values and beliefs of the American people' " is difficult to pin down, *ante,* at 583—any more than a civil service preference in favor of those who display "Republican-Party values" would be rendered nondiscriminatory by the fact that there is plenty of room for argument as to what Republican-Party values might be.

---

[1] If there is any uncertainty on the point, it relates only to the adjective, which is not at issue in the current discussion. That is, one might argue that the decency and respect factors constitute *content* discrimination rather than *viewpoint* discrimination, which would render them easier to uphold. Since I believe this statute must be upheld in either event, I pass over this conundrum and assume the worst.

The "political context surrounding the adoption of the 'decency and respect' clause," which the Court discusses at some length, *ante*, at 581, does not change its meaning or affect its constitutionality. All that is proved by the various statements that the Court quotes from the Report of the Independent Commission and the floor debates is (1) that the provision was not meant categorically to exclude any particular viewpoint (which I have conceded, and which is plain from the text), and (2) that the language was not meant to do anything that is unconstitutional. That in no way propels the Court's leap to the countertextual conclusion that the provision was merely "aimed at reforming procedures," and cannot be "utilized as a tool for invidious viewpoint discrimination," *ante*, at 582. It is evident in the legislative history that § 954(d)(1) was prompted by, and directed at, the public funding of such offensive productions as Serrano's "Piss Christ," the portrayal of a crucifix immersed in urine, and Mapplethorpe's show of lurid homoerotic photographs. Thus, even if one strays beyond the plain text it is perfectly clear that the statute was meant to disfavor—that is, to discriminate against—such productions. Not to ban their funding absolutely, to be sure (though as I shall discuss, that also would not have been unconstitutional), but to make their funding more difficult.

More fundamentally, of course, all this legislative history has no valid claim upon our attention at all. It is a virtual certainty that very few of the Members of Congress who voted for this language both (1) knew of, and (2) agreed with, the various statements that the Court has culled from the Report of the Independent Commission and the floor debate (probably conducted on an almost empty floor). And it is wholly irrelevant that the statute was a "bipartisan proposal introduced as a counterweight" to an alternative proposal that would directly restrict funding on the basis of viewpoint. See *ante*, at 581–582. We do not judge statutes as

if we are surveying the scene of an accident; each one is reviewed, not on the basis of how much worse it could have been, but on the basis of what it says. See *United States* v. *Estate of Romani,* 523 U. S. 519, 535 (1998) (SCALIA, J., concurring in part and concurring in judgment). It matters not whether this enactment was the product of the most partisan alignment in history or whether, upon its passage, the Members all linked arms and sang, "The more we get together, the happier we'll be." It is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (1951). The law at issue in this case is to be found in the text of § 954(d)(1), which passed both Houses and was signed by the President, U. S. Const., Art. I, § 7. And that law unquestionably disfavors—discriminates against—indecency and disrespect for the diverse beliefs and values of the American people. I turn, then, to whether such viewpoint discrimination violates the Constitution.

## II

### WHAT THE STATUTE SAYS IS CONSTITUTIONAL

The Court devotes so much of its opinion to explaining why this statute means something other than what it says that it neglects to cite the constitutional text governing our analysis. The First Amendment reads: "Congress shall make no law . . . *abridging* the freedom of speech." U. S. Const., Amdt. 1 (emphasis added). To abridge is "to contract, to diminish; to deprive of." T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796). With the enactment of § 954(d)(1), Congress did not *abridge* the speech of those who disdain the beliefs and values of the American public, nor did it *abridge* indecent speech. Those who wish to create indecent and disrespectful art are as unconstrained now as they were before the enactment of this statute. *Avant-garde artistes* such as respondents remain

entirely free to *épater les bourgeois;*[2] they are merely deprived of the additional satisfaction of having the bourgeoisie taxed to pay for it. It is preposterous to equate the denial of taxpayer subsidy with measures " " "aimed at the *suppression* of dangerous ideas." ' " *Regan* v. *Taxation with Representation of Wash.,* 461 U. S. 540, 550 (1983) (emphasis added) (quoting *Cammarano* v. *United States,* 358 U. S. 498, 513 (1959), in turn quoting *Speiser* v. *Randall,* 357 U. S. 513, 519 (1958)). "The reason that denial of participation in a tax exemption or other subsidy scheme does not necessarily 'infringe' a fundamental right is that—unlike direct restriction or prohibition—such a denial does not, as a general rule, have any significant coercive effect." *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 237 (1987) (SCALIA, J., dissenting).

One might contend, I suppose, that a threat of rejection by the only available source of free money would constitute coercion and hence "abridgment" within the meaning of the First Amendment. Cf. *Norwood* v. *Harrison,* 413 U. S. 455, 465 (1973). I would not agree with such a contention, which would make the NEA the mandatory patron of all art too

---

[2] Which they do quite well. The *oeuvres d'art* for which the four individual plaintiffs in this case sought funding have been described as follows: "Finley's controversial show, 'We Keep Our Victims Ready,' contains three segments. In the second segment, Finley visually recounts a sexual assault by stripping to the waist and smearing chocolate on her breasts and by using profanity to describe the assault. Holly Hughes' monologue 'World Without End' is a somewhat graphic recollection of the artist's realization of her lesbianism and reminiscence of her mother's sexuality. John Fleck, in his stage performance 'Blessed Are All the Little Fishes,' confronts alcoholism and Catholicism. During the course of the performance, Fleck appears dressed as a mermaid, urinates on the stage and creates an altar out of a toilet bowl by putting a photograph of Jesus Christ on the lid. Tim Miller derives his performance 'Some Golden States' from childhood experiences, from his life as a homosexual, and from the constant threat of AIDS. Miller uses vegetables in his performances to represent sexual symbols." Note, 48 Wash. & Lee L. Rev. 1545, 1546, n. 2 (1991) (citations omitted).

indecent, too disrespectful, or even too *kitsch* to attract private support. But even if one accepts the contention, it would have no application here. The NEA is far from the sole source of funding for art—even indecent, disrespectful, or just plain bad art. Accordingly, the Government may earmark NEA funds for projects it deems to be in the public interest without thereby abridging speech. *Regan* v. *Taxation with Representation of Wash., supra,* at 549.

Section 954(d)(1) is no more discriminatory, and no less constitutional, than virtually every other piece of funding legislation enacted by Congress. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program . . . ." *Rust* v. *Sullivan,* 500 U. S. 173, 193 (1991). As we noted in *Rust,* when Congress chose to establish the National Endowment for Democracy it was not constitutionally required to fund programs encouraging competing philosophies of government—an example of funding discrimination that cuts much closer than this one to the core of *political* speech which is the primary concern of the First Amendment. See *id.,* at 194. It takes a particularly high degree of chutzpah for the NEA to contradict this proposition, since the agency itself discriminates—and is required by law to discriminate—in favor of artistic (as opposed to scientific, or political, or theological) expression. Not all the common folk, or even all great minds, for that matter, think that is a good idea. In 1800, when John Marshall told John Adams that a recent immigration of Frenchmen would include talented artists, "Adams denounced all Frenchmen, but most especially 'schoolmasters, painters, poets, &C.' He warned Marshall that the fine arts were like germs that infected healthy constitutions." J. Ellis, After the Revolution: Profiles of Early American Culture 36 (1979). Surely the NEA itself is nothing less than an institutionalized discrimination against that point of view. Nonetheless, it is consti-

tutional, as is the congressional determination to favor decency and respect for beliefs and values over the opposite because such favoritism does not "abridge" anyone's freedom of speech.

Respondents, relying on *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 833 (1995), argue that viewpoint-based discrimination is impermissible unless the government is the speaker or the government is "disburs-[ing] public funds to private entities to convey a governmental message." *Ibid.* It is impossible to imagine why that should be so; one would think that directly involving the government itself in the viewpoint discrimination (if it is unconstitutional) would make the situation even worse. Respondents are mistaken. It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary. And it makes not a bit of difference, insofar as either common sense or the Constitution is concerned, whether these officials further their (and, in a democracy, our) favored point of view by achieving it directly (having government-employed artists paint pictures, for example, or government-employed doctors perform abortions); or by advocating it officially (establishing an Office of Art Appreciation, for example, or an Office of Voluntary Population Control); or by giving money to others who achieve or advocate it (funding private art classes, for example, or Planned Parenthood).[3] None of this has anything to do with abridging anyone's speech. *Rosenberger*, as the Court explains, *ante*, at 586, found the view-

---

[3] I suppose it would be unconstitutional for the government to give money to an organization devoted to the promotion of candidates nominated by the Republican Party—but it would be just as unconstitutional for the government itself to promote candidates nominated by the Republican Party, and I do not think that that unconstitutionality has anything to do with the First Amendment.

point discrimination unconstitutional, not because funding of "private" speech was involved, but because the government had established a limited public forum—to which the NEA's granting of highly selective (if not highly discriminating) awards bears no resemblance.

The nub of the difference between me and the Court is that I regard the distinction between "abridging" speech and funding it as a fundamental divide, on this side of which the First Amendment is inapplicable. The Court, by contrast, seems to believe that the First Amendment, despite its words, has some ineffable effect upon funding, imposing constraints of an indeterminate nature which it announces (without troubling to enunciate any particular test) are not violated by the statute here—or, more accurately, are not violated by the quite different, emasculated statute that it imagines. "[T]he Government," it says, "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *ante*, at 587–588. The Government, *I* think, may allocate both competitive and noncompetitive funding *ad libitum*, insofar as the First Amendment is concerned.

Finally, what is true of the First Amendment is also true of the constitutional rule against vague legislation: it has no application to funding. Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct, see *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972), not government grant programs. In the former context, vagueness produces an abridgment of lawful speech; in the latter it produces, at worst, a waste of money. I cannot refrain from observing, however, that if the vagueness doctrine *were* applicable, the agency charged with making grants under a statutory standard of "artistic excellence"—and which has itself thought that standard met by everything from the playing of Beethoven to a depiction of

a crucifix immersed in urine—would be of more dubious constitutional validity than the "decency" and "respect" limitations that respondents (who demand to be judged on the same strict standard of "artistic excellence") have the humorlessness to call too vague.

\* \* \*

In its laudatory description of the accomplishments of the NEA, *ante*, at 574, the Court notes with satisfaction that "only a handful of the agency's roughly 100,000 awards have generated formal complaints," *ibid.* The Congress that felt it necessary to enact § 954(d)(1) evidently thought it much *more* noteworthy that *any* money exacted from American taxpayers had been used to produce a crucifix immersed in urine or a display of homoerotic photographs. It is no secret that the provision was prompted by, and directed at, the funding of such offensive productions. Instead of banning the funding of such productions absolutely, which I think would have been entirely constitutional, Congress took the lesser step of requiring them to be disfavored in the evaluation of grant applications. The Court's opinion today renders even that lesser step a nullity. For that reason, I concur only in the judgment.

JUSTICE SOUTER, dissenting.

The question here is whether the italicized segment of this statute is unconstitutional on its face: "[A]rtistic excellence and artistic merit are the criteria by which applications [for grants from the National Endowment for the Arts (NEA)] are judged, *taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.*" 20 U. S. C. § 954(d) (emphasis added). It is.

The decency and respect proviso mandates viewpoint-based decisions in the disbursement of Government subsidies, and the Government has wholly failed to explain why the statute should be afforded an exemption from the funda-

mental rule of the First Amendment that viewpoint discrimination in the exercise of public authority over expressive activity is unconstitutional. The Court's conclusions that the proviso is not viewpoint based, that it is not a regulation, and that the NEA may permissibly engage in viewpoint-based discrimination, are all patently mistaken. Nor may the question raised be answered in the Government's favor on the assumption that some constitutional applications of the statute are enough to satisfy the demand of facial constitutionality, leaving claims of the proviso's obvious invalidity to be dealt with later in response to challenges of specific applications of the discriminatory standards. This assumption is irreconcilable with our longstanding and sensible doctrine of facial overbreadth, applicable to claims brought under the First Amendment's speech clause. I respectfully dissent.

I

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas," *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972), which is to say that "[t]he principle of viewpoint neutrality . . . underlies the First Amendment," *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 505 (1984). Because this principle applies not only to affirmative suppression of speech, but also to disqualification for government favors, Congress is generally not permitted to pivot discrimination against otherwise protected speech on the offensiveness or unacceptability of the views it expresses. See, *e. g., Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995) (public university's student activities funds may not be disbursed on viewpoint-based terms); *Lamb's Chapel* v. *Center Moriches*

*Union Free School Dist.*, 508 U. S. 384 (1993) (after-hours access to public school property may not be withheld on the basis of viewpoint); *Leathers* v. *Medlock*, 499 U. S. 439, 447 (1991) ("[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints"); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1 (1986) (government-mandated access to public utility's billing envelopes must not be viewpoint based); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others").

It goes without saying that artistic expression lies within this First Amendment protection. See, *e. g.*, *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 569 (1995) (remarking that examples of painting, music, and poetry are "unquestionably shielded"); *Ward* v. *Rock Against Racism*, 491 U. S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment"); *Schad* v. *Mount Ephraim*, 452 U. S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee"); *Kaplan* v. *California*, 413 U. S. 115, 119–120 (1973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection"). The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political,[1] but simply on their expressive character, which

---

[1] Art "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 501 (1952).

falls within a spectrum of protected "speech" extending outward from the core of overtly political declarations. Put differently, art is entitled to full protection because our "cultural life," just like our native politics, "rest[s] upon [the] ideal" of governmental viewpoint neutrality. *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 641 (1994).

When called upon to vindicate this ideal, we characteristically begin by asking "whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward* v. *Rock Against Racism, supra,* at 791 (citation omitted). The answer in this case is damning. One need do nothing more than read the text of the statute to conclude that Congress's purpose in imposing the decency and respect criteria was to prevent the funding of art that conveys an offensive message; the decency and respect provision on its face is quintessentially viewpoint based, and quotations from the Congressional Record merely confirm the obvious legislative purpose. In the words of a cosponsor of the bill that enacted the proviso, "[w]orks which deeply offend the sensibilities of significant portions of the public ought not to be supported with public funds." 136 Cong. Rec. 28624 (1990).[2] Another supporter of the bill observed that "the Endowment's support for artists like Robert Mapplethorpe and Andre[s] Serrano has offended and angered many citizens," behooving "Congress . . . to listen to these complaints about the NEA and make sure that exhibits like [these] are not funded again." *Id.,* at 28642. Indeed, if there were any question at all about what Congress had in

_____

[2] There is, of course, nothing whatsoever unconstitutional about this view as a general matter. Congress has no obligation to support artistic enterprises that many people detest. The First Amendment speaks up only when Congress decides to participate in the Nation's artistic life by legal regulation, as it does through a subsidy scheme like the NEA. If Congress does choose to spend public funds in this manner, it may not discriminate by viewpoint in deciding who gets the money.

mind, a definitive answer comes in the succinctly accurate remark of the proviso's author, that the bill "add[s] to the criteria of artistic excellence and artistic merit, a shell, a screen, a viewpoint that must be constantly taken into account." *Id.*, at 28631.[3]

## II

In the face of such clear legislative purpose, so plainly expressed, the Court has its work cut out for it in seeking a

---

[3] On the subject of legislative history and purpose, it is disturbing that the Court upholds § 954(d) in part because the statute was drafted in hope of avoiding constitutional objections, with some Members of Congress proclaiming its constitutionality on the congressional floor.   See *ante*, at 581–582.   Like the Court, I assume that many Members of Congress believed the bill to be constitutional.   Indeed, Members of Congress must take an oath or affirmation to support the Constitution, see U. S. Const., Art. VI, cl. 3, and we should presume in every case that Congress believed its statute to be consistent with the constitutional commands, see, *e. g.*, *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 73 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution"); *Yates* v. *United States*, 354 U. S. 298, 319 (1957). But courts cannot allow a legislature's conclusory belief in constitutionality, however sincere, to trump incontrovertible unconstitutionality, for "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803).

I recognize, as the court explains, *ante*, at 581, that the amendment adding the decency and respect proviso was a bipartisan counterweight to more severe alternatives, and that some Members of Congress may have voted for it simply because it seemed the least among various evils.   See, *e. g.*, 136 Cong. Rec. 28670 (1990) ("I am not happy with all aspects of the Williams-Coleman substitute . . . . It . . . contains language concerning standards of decency that I find very troubling.   But I applaud Mr. WIL-LIAMS for his efforts in achieving this compromise under very difficult circumstances . . . . I support the Williams-Coleman substitute").   Perhaps the proviso was the mildest alternative available, but that simply proves that the bipartisan push to reauthorize the NEA could succeed only by including at least some viewpoint-based limitations.   An appreciation of alternatives does not alter the fact that Congress passed decency and respect restrictions, and it did so knowing and intending that those restrictions would prevent future controversies stemming from the NEA's funding of inflammatory art projects, by declaring the inflammatory to be disfavored for funding.

constitutional reading of the statute. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988).

## A

The Court says, first, that because the phrase "general standards of decency and respect for the diverse beliefs and values of the American public" is imprecise and capable of multiple interpretations, "the considerations that the provision introduces, by their nature, do not engender the kind of directed viewpoint discrimination that would prompt this Court to invalidate a statute on its face." *Ante,* at 583. Unquestioned case law, however, is clearly to the contrary.

"Sexual expression which is indecent but not obscene is protected by the First Amendment," *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 126 (1989), and except when protecting children from exposure to indecent material, see *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978), the First Amendment has never been read to allow the government to rove around imposing general standards of decency, see, *e. g., Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997) (striking down on its face a statute that regulated "indecency" on the Internet). Because "the normal definition of 'indecent' . . . refers to nonconformance with accepted standards of morality," *FCC* v. *Pacifica Foundation, supra,* at 740, restrictions turning on decency, especially those couched in terms of "general standards of decency," are quintessentially viewpoint based: they require discrimination on the basis of conformity with mainstream mores. The Government's contrary suggestion that the NEA's decency standards restrict only the "form, mode, or style" of artistic expression, not the underlying viewpoint or message, Brief for Petitioners 39–41, may be a tempting abstraction (and one not lacking in support, cf. *Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 83–84 (1983) (STEVENS, J., concurring in judgment)). But here it suffices to realize that "form, mode, or style" are not subject to ab-

straction from artistic viewpoint, and to quote from an opinion just two years old: "In artistic . . . settings, indecency may have strong communicative content, protesting conventional norms or giving an edge to a work by conveying otherwise inexpressible emotions. . . . Indecency often is inseparable from the ideas and viewpoints conveyed, or separable only with loss of truth or expressive power." *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 805 (1996) (KENNEDY, J., joined by GINSBURG, J., concurring) (citation and internal quotation marks omitted); see also *Cohen* v. *California*, 403 U. S. 15, 26 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process"). "[T]he inextricability of indecency from expression," *Denver Area Ed. Telecommunications Consortium, supra*, at 805, is beyond dispute in a certain amount of entirely lawful artistic enterprise. Starve the mode, starve the message.

Just as self-evidently, a statute disfavoring speech that fails to respect America's "diverse beliefs and values" is the very model of viewpoint discrimination; it penalizes any view disrespectful to any belief or value espoused by someone in the American populace. Boiled down to its practical essence, the limitation obviously means that art that disrespects the ideology, opinions, or convictions of a significant segment of the American public is to be disfavored, whereas art that reinforces those values is not. After all, the whole point of the proviso was to make sure that works like Serrano's ostensibly blasphemous portrayal of Jesus would not be funded, see *supra*, at 603, while a reverent treatment, conventionally respectful of Christian sensibilities, would not run afoul of the law. Nothing could be more viewpoint based than that. Cf. *Rosenberger*, 515 U. S., at 831 (a statute targeting a "prohibited perspective, not the general subject matter" of religion is viewpoint based); *United States* v. *Eichman*, 496 U. S. 310, 317 (1990) (striking down anti-flag-

burning statute because it impermissibly prohibited speech that was "disrespectful" of the flag). The fact that the statute disfavors art insufficiently respectful of America's "diverse" beliefs and values alters this conclusion not one whit: the First Amendment does not validate the ambition to disqualify many disrespectful viewpoints instead of merely one. See *Rosenberger, supra,* at 831–832.

## B

Another alternative for avoiding unconstitutionality that the Court appears to regard with some favor is the Government's argument that the NEA may comply with § 954(d) merely by populating the advisory panels that analyze grant applications with members of diverse backgrounds. See *ante,* at 577, 581. Would that it were so easy; this asserted implementation of the law fails even to "reflec[t] a plausible construction of the plain language of the statute." *Rust* v. *Sullivan,* 500 U. S. 173, 184 (1991).

The Government notes that § 954(d) actually provides that "[i]n establishing . . . regulations and procedures, the Chairperson [of the NEA] shall ensure that (1) artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." According to the Government, this language requires decency and respect to be considered not in judging applications, but in making regulations. If, then, the Chairperson takes decency and respect into consideration through regulations ensuring diverse panels, the statute is satisfied. But it would take a great act of will to find any plausibility in this reading. The reference to considering decency and respect occurs in the subparagraph speaking to the "criteria by which applications are judged," not in the preamble directing the Chairperson to adopt regulations; it is in judging applications that decency and respect are most obviously to be considered. It is no surprise, then, that the

Government's reading is directly contradicted by the legislative history. According to the provision's author, the decency and respect proviso "mandates that in the awarding of funds, in the award process itself, general standards of decency must be accorded." 136 Cong. Rec. 28672 (1990). Or, as the cosponsor of the bill put it, "the decisions of artistic excellence must take into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.*, at 28624.

The Government offers a variant of this argument in suggesting that even if the NEA must take decency and respect into account in the active review of applications, it may satisfy the statute by doing so in an indirect way through the natural behavior of diversely constituted panels. This, indeed, has apparently been the position of the Chairperson of the NEA since shortly after the legislation was first passed. But the problems with this position are obvious. First, it defies the statute's plain language to suggest that the NEA complies with the law merely by allowing decency and respect to have their way through the subconscious inclinations of panel members. "[T]aking into consideration" is a conscious activity. See Webster's New International Dictionary 2570 (2d ed. 1949) (defining "take into consideration" as "[t]o make allowance in judging for"); *id.*, at 569 (defining "consideration" as the "[a]ct or process of considering; continuous and careful thought; examination; deliberation; attention"); *id.*, at 568 (defining "consider" as "to think on with care . . . to bear in mind"). Second, even assuming that diverse panel composition would produce a sufficient response to the proviso, that would merely mean that selection for decency and respect would occur derivatively through the inclinations of the panel members, instead of directly through the intentional application of the criteria; at the end of the day, the proviso would still serve its purpose to screen out offending artistic works, and it would still be unconstitutional. Finally, a less obvious but equally dispositive re-

sponse is that reading the statute as a mandate that may be satisfied merely by selecting diverse panels renders § 954(d)(1) essentially redundant of § 959(c), which provides that the review panels must comprise "individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view." Statutory interpretations that "render superfluous other provisions in the same enactment" are strongly disfavored. *Freytag* v. *Commissioner*, 501 U. S. 868, 877 (1991) (internal quotation marks omitted).

## C

A third try at avoiding constitutional problems is the Court's disclaimer of any constitutional issue here because "[§] 954(d)(1) adds 'considerations' to the grant-making process; it does not preclude awards to projects that might be deemed 'indecent' or 'disrespectful,' nor place conditions on grants, or even specify that those factors must be given any particular weight in reviewing an application." *Ante*, at 580–581. Since "§ 954(d)(1) admonishes the NEA merely to take 'decency and respect' into consideration," *ante*, at 582, not to make funding decisions specifically on those grounds, the Court sees no constitutional difficulty.

That is not a fair reading. Just as the statute cannot be read as anything but viewpoint based, or as requiring nothing more than diverse review panels, it cannot be read as tolerating awards to spread indecency or disrespect, so long as the review panel, the National Council on the Arts, and the Chairperson have given some thought to the offending qualities and decided to underwrite them anyway. That, after all, is presumably just what prompted the congressional outrage in the first place, and there was nothing naive about the Representative who said he voted for the bill because it does "not tolerate wasting Federal funds for sexually explicit photographs [or] sacrilegious works." 136 Cong. Rec. 28676 (1990).

But even if I found the Court's view of "consideration" plausible, that would make no difference at all on the question of constitutionality. What if the statute required a panel to apply criteria "taking into consideration the centrality of Christianity to the American cultural experience," or "taking into consideration whether the artist is a communist," or "taking into consideration the political message conveyed by the art," or even "taking into consideration the superiority of the white race"? Would the Court hold these considerations facially constitutional, merely because the statute had no requirement to give them any particular, much less controlling, weight? I assume not. In such instances, the Court would hold that the First Amendment bars the government from considering viewpoint when it decides whether to subsidize private speech, and a statute that mandates the consideration of viewpoint is quite obviously unconstitutional. Cf. *Dawson* v. *Delaware*, 503 U. S. 159, 167 (1992) (holding that the First Amendment forbids reliance on a defendant's abstract beliefs at sentencing, even if they are considered as one factor among many); *Ozonoff* v. *Berzak*, 744 F. 2d 224, 233 (CA1 1984) (Breyer, J.) (holding that an Executive Order which provided that a person's political associations *"may* be considered" in determining security clearance violated the First Amendment). Section 954(d)(1) is just such a statute.

## III

A second basic strand in the Court's treatment of today's question, see *ante,* at 585–587, and the heart of JUSTICE SCALIA's, see *ante,* at 595–599, in effect assume that whether or not the statute mandates viewpoint discrimination, there is no constitutional issue here because government art subsidies fall within a zone of activity free from First Amendment restraints. The Government calls attention to the roles of government-as-speaker and government-as-buyer, in which the government is of course entitled to engage in view-

point discrimination: if the Food and Drug Administration launches an advertising campaign on the subject of smoking, it may condemn the habit without also having to show a cowboy taking a puff on the opposite page;[4] and if the Secretary of Defense wishes to buy a portrait to decorate the Pentagon, he is free to prefer George Washington over George the Third.[5]

The Government freely admits, however, that it neither speaks through the expression subsidized by the NEA,[6] nor buys anything for itself with its NEA grants. On the contrary, believing that "[t]he arts . . . reflect the high place accorded by the American people to the nation's rich cultural heritage," § 951(6), and that "[i]t is vital to a democracy . . . to provide financial assistance to its artists and the organizations that support their work," § 951(10), the Government acts as a patron, financially underwriting the production of art by private artists and impresarios for independent consumption. Accordingly, the Government would have us liberate government-as-patron from First Amendment strictures not by placing it squarely within the categories of government-as-buyer or government-as-speaker,

---

[4] See *Rust* v. *Sullivan*, 500 U. S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, 22 U. S. C. § 4411(b), it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism").

[5] On proposing the Public Works Art Project (PWAP), the New Deal program that hired artists to decorate public buildings, President Roosevelt allegedly remarked: "I can't have a lot of young enthusiasts painting Lenin's head on the Justice Building." Quoted in Mankin, Federal Arts Patronage in the New Deal, in America's Commitment to Culture: Government and the Arts 77 (K. Mulcahy & M. Wyszomirski eds. 1995). He was buying, and was free to take his choice.

[6] Here, the "communicative element inherent in the very act of funding itself," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 892–893, n. 11 (1995) (SOUTER, J., dissenting), is an endorsement of the importance of the arts collectively, not an endorsement of the individual message espoused in a given work of art.

but by recognizing a new category by analogy to those accepted ones. The analogy is, however, a very poor fit, and this patronage falls embarrassingly on the wrong side of the line between government-as-buyer or -speaker and government-as-regulator-of-private-speech.

The division is reflected quite clearly in our precedents. Drawing on the notion of government-as-speaker, we held in *Rust* v. *Sullivan*, 500 U. S., at 194, that the Government was entitled to appropriate public funds for the promotion of particular choices among alternatives offered by health and social service providers (*e. g.*, family planning with, and without, resort to abortion). When the government promotes a particular governmental program, "it is entitled to define the limits of that program," and to dictate the viewpoint expressed by speakers who are paid to participate in it. *Ibid.*[7] But we added the important qualifying language that "[t]his is not to suggest that funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is invariably sufficient to justify Government control over the content of expression." *Id.*, at 199. Indeed, outside of the contexts of government-as-buyer and government-as-speaker, we have held time and time again that Congress may not "discriminate invidiously in its subsidies in such a way as to aim at the suppression of . . . ideas." *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 548 (1983) (internal quotation marks and brackets omitted); see also *Lamb's Chapel*, 508 U. S., at 394 (when the government subsidizes private speech, it may not "favor some viewpoints or ideas at the expense of others"); *Hannegan* v. *Esquire, Inc.*, 327

---

[7] In *Rust*, "the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger, supra*, at 833 (citing *Rust, supra*, at 194).

U. S. 146, 149 (1946) (the Postmaster General may not deny subsidies to certain periodicals on the ground that they are "'morally improper and not for the public welfare and the public good'").

Our most thorough statement of these principles is found in the recent case of *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), which held that the University of Virginia could not discriminate on viewpoint in underwriting the speech of student-run publications. We recognized that the government may act on the basis of viewpoint "when the State is the speaker" or when the State "disburses public funds to private entities to convey a governmental message." *Id.*, at 833. But we explained that the government may not act on viewpoint when it "does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.*, at 834. When the government acts as patron, subsidizing the expression of others, it may not prefer one lawfully stated view over another.

*Rosenberger* controls here. The NEA, like the student activities fund in *Rosenberger*, is a subsidy scheme created to encourage expression of a diversity of views from private speakers. Congress brought the NEA into being to help all Americans "achieve a better understanding of the past, a better analysis of the present, and a better view of the future." § 951(3). The NEA's purpose is to "support new ideas" and "to help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." §§ 951(10), (7); see also S. Rep. No. 300, 89th Cong., 1st Sess., 4 (1965) ("[T]he intent of this act should be the encouragement of free inquiry and expression"); H. R. Rep. No. 99–274, p. 13 (1985) (Committee Report accompanying bill to reauthorize and amend the NEA's governing statute) ("As the Preamble of the act directs, the Endowment['s] programs should be open and richly diverse, reflecting the ferment of ideas which has always made this Nation strong and free"). Given this

congressional choice to sustain freedom of expression, *Rosenberger* teaches that the First Amendment forbids decisions based on viewpoint popularity. So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values. It may not use the NEA's purse to "suppres[s] . . . dangerous ideas." *Regan* v. *Taxation with Representation of Wash., supra,* at 548 (internal quotation marks omitted).

The Court says otherwise, claiming to distinguish *Rosenberger* on the ground that the student activities funds in that case were generally available to most applicants, whereas NEA funds are disbursed selectively and competitively to a choice few. *Ante,* at 586. But the Court in *Rosenberger* anticipated and specifically rejected just this distinction when it held in no uncertain terms that "[t]he government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity." 515 U. S., at 835.[8] Scarce money demands choices, of course, but choices "on some acceptable [viewpoint] neutral principle," like artistic excellence and artistic merit;[9] "nothing in our decision[s] in-

---

[8] The Court's attempt to avoid *Rosenberger* by describing NEA funding in terms of competition, not scarcity, will not work. Competition implies scarcity, without which there is no exclusive prize to compete for; the Court's "competition" is merely a surrogate for "scarcity."

[9] While criteria of "artistic excellence and artistic merit" may raise intractable issues about the identification of artistic worth, and could no doubt be used covertly to filter out unwanted ideas, there is nothing inherently viewpoint discriminatory about such merit-based criteria. We have noted before that an esthetic government goal is perfectly legitimate. See *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 507–508 (1981) (plurality opinion). Decency and respect, on the other hand, are inherently and facially viewpoint based, and serve no legitimate and permissible end. The Court's assertion that the mere fact that grants must be awarded according to artistic merit precludes "absolute neutrality" on the part of the

dicate[s] that scarcity would give the State the right to exercise viewpoint discrimination that is otherwise impermissible." *Ibid.;* see also *Arkansas Ed. Television Comm'n* v. *Forbes,* 523 U. S. 666, 676 (1998) (scarcity of air time does not justify viewpoint-based exclusion of candidates from a debate on public television; neutral selection criteria must be employed). If the student activities fund at issue in *Rosenberger* had awarded competitive, merit-based grants to only 50%, or even 5%, of the applicants, on the basis of "journalistic merit taking into consideration the message of the newspaper," it is obvious beyond peradventure that the Court would not have come out differently, leaving the University free to refuse funding after considering a publication's Christian perspective.[10]

A word should be said, finally, about a proposed alternative to this failed analogy. As the Solicitor General put it

---

NEA, *ante,* at 585, is therefore misdirected. It is not to the point that the Government necessarily makes choices among competing applications, or even that its judgments about artistic quality may be branded as subjective to some greater or lesser degree; the question here is whether the Government may apply patently viewpoint-based criteria in making those choices.

[10] JUSTICE SCALIA suggests that *Rosenberger* turned not on the distinction between government-as-speaker and government-as-facilitator-of-private-speech, but rather on the fact that "the government had established a limited public forum." *Ante,* at 599. Leaving aside the proper application of forum analysis to the NEA and its projects, I cannot agree that the holding of *Rosenberger* turned on characterizing its metaphorical forum as public in some degree. Like this case, *Rosenberger* involved viewpoint discrimination, and we have made it clear that such discrimination is impermissible in all forums, even nonpublic ones, *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 806 (1985), where, by definition, the government has not made public property generally available to facilitate private speech, *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 46 (1983) (defining a nonpublic forum as "[p]ublic property which is not by tradition or designation a forum for public communication"). Accordingly, *Rosenberger*'s brief allusion to forum analysis was in no way determinative of the Court's holding.

at oral argument, "there is something unique ... about the Government funding of the arts for First Amendment purposes." Tr. of Oral Arg. 27. However different the governmental patron may be from the governmental speaker or buyer, the argument goes, patronage is also singularly different from traditional regulation of speech, and the limitations placed on the latter would be out of place when applied to viewpoint discrimination in distributing patronage. To this, there are two answers. The first, again, is *Rosenberger*, which forecloses any claim that the NEA and the First Amendment issues that arise under it are somehow unique. But even if we had no *Rosenberger*, and even if I thought the NEA's program of patronage was truly singular, I would not hesitate to reject the Government's plea to recognize a new, categorical patronage exemption from the requirement of viewpoint neutrality. I would reject it for the simple reason that the Government has offered nothing to justify recognition of a new exempt category.

The question of who has the burden to justify a categorical exemption has never been explicitly addressed by this Court, despite our recognition of the speaker and buyer categories in the past. The answer is nonetheless obvious in a recent statement by the Court synthesizing a host of cases on viewpoint discrimination. "The First Amendment presumptively places this sort of discrimination beyond the power of the government." *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991). Because it takes something to defeat a presumption, the burden is necessarily on the Government to justify a new exception to the fundamental rules that give life to the First Amendment. It is up to the Government to explain why a sphere of governmental participation in the arts (unique or not) should be treated as outside traditional First Amendment limits. The Government has not carried this burden here, or even squarely faced it.

## IV

Although I, like the Court, recognize that "facial challenges to legislation are generally disfavored," *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 223 (1990), the proviso is the type of statute that most obviously lends itself to such an attack. The NEA does not offer a list of reasons when it denies a grant application, and an artist or exhibitor whose subject raises a hint of controversy can never know for sure whether the decency and respect criteria played a part in any decision by the NEA to deny funding. Hence, the most that we could hope for in waiting for an as-applied challenge would be (a) a plaintiff whose rejected proposal raised some risk of offense and was not aimed at exhibition in a forum in which decency and respect might serve as permissible selection criteria, or (b) a plaintiff who sought funding for a project that had been sanitized to avoid rejection. But no one has denied here that the institutional plaintiff, the National Association of Artists' Organizations (NAAO), has representative standing on behalf of some such potential plaintiffs. See App. 21–25 (declaration of NAAO's Executive Director, listing examples of the potentially objectionable works produced by several member organizations). We would therefore gain nothing at all by dismissing this case and requiring those individuals or groups to bring essentially the same suit, restyled as an as-applied challenge raising one of the possibilities just mentioned.

In entertaining this challenge, the Court finds § 954(d)(1) constitutional on its face in part because there are "a number of indisputably constitutional applications" for both the "decency" and the "respect" criteria, *ante,* at 584, and it is hard to imagine "how 'decency' or 'respect' would bear on grant applications in categories such as funding for symphony orchestras," *ante,* at 583. There are circumstances in which we have rejected facial challenges for similar reasons. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger

must establish that no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno,* 481 U. S. 739, 745 (1987). But quite apart from any question that might be raised about that statement as a general rule,[11] it is beyond question, as the Court freely concedes, that it can have no application here, it being well settled that the general rule does not limit challenges brought under the First Amendment's speech clause.

There is an "exception to th[e] [capable-of-constitutional-application] rule recognized in our jurisprudence [for] facial challenge[s] based upon First Amendment free-speech grounds. We have applied to statutes restricting speech a so-called 'overbreadth' doctrine, rendering such a statute invalid in all its applications (*i. e.,* facially invalid) if it is invalid in any of them." *Ada* v. *Guam Society of Obstetricians & Gynecologists,* 506 U. S. 1011, 1012 (1992) (SCALIA, J., dissenting from denial of certiorari);[12] see, *e. g., Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997) (striking down decency provision of Communications Decency Act as facially overbroad); *id.,* at 893–894 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (declining to apply the rule of *Salerno* because the plaintiffs' claim arose under the First Amendment); *Schad* v. *Mount Ephraim,* 452 U. S., at 66 ("Because appellants' claims are rooted in the First Amendment, they are entitled to . . . raise an overbreadth challenge") (internal quotation marks omitted); *Gooding* v. *Wilson,* 405 U. S. 518, 521–522 (1972).[13] Thus,

---

[11] Cf., *e. g., Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 895 (1992) (statute restricting abortion will be struck down if, "in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion").

[12] We have, however, recognized that "the overbreadth doctrine does not apply to commercial speech." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 497 (1982).

[13] Cf. *United States* v. *Salerno,* 481 U. S. 739, 745 (1987) ("The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since

we have routinely understood the overbreadth doctrine to apply where the plaintiff mounts a facial challenge to a law investing the government with discretion to discriminate on viewpoint when it parcels out benefits in support of speech. See, *e. g., City of Lakewood* v. *Plain Dealer Publishing Co.,* 486 U. S. 750, 759 (1988) ("[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers"); *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123 (1992) (applying overbreadth doctrine to invalidate on its face an ordinance allowing for content-based discrimination in the awarding of parade permits).

To be sure, such a "facial challenge will not succeed unless the statute is 'substantially' overbroad," *New York State Club Assn., Inc.* v. *City of New York,* 487 U. S. 1, 11 (1988), by which we mean that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications," *New York* v. *Ferber,* 458 U. S. 747, 771 (1982). But that is no impediment to invalidation here. The Court speculates that the "decency" criterion might permissibly be applied to applications seeking to create or display art in schools[14] or children's museums, whereas the "respect" criterion might permissibly be applied to applications

we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment").

[14] In placing such emphasis on the potential applicability of the decency criterion to educational programs, the Court neglects to point out the existence of § 954a, entitled "[a]ccess to the arts through support of education," which is concerned specifically with funding for arts education, especially in elementary and secondary schools. It seems that the NEA's "mission" to promote arts education, *ante,* at 584, is carried out primarily through § 954a, not § 954. While the decency standard might be constitutionally permissible when applied to applications for grants under § 954a, that standard does not appear to be relevant to such applications at all; the decency and respect provision appears in § 954(d), which governs grant applications under § 954, not under § 954a.

seeking to create art that celebrates a minority, tribal, rural, or inner-city culture. But even so, this is certainly a case in which the challenged statute "reaches a substantial number of impermissible applications," not one in which the statute's "legitimate reach dwarfs its arguably impermissible applications." *Id.*, at 771, 773. On the contrary, nothing in the record suggests that the grant scheme administered under the broad authorization of the NEA's governing statute, see §§ 951, 954(c), devotes an overwhelming proportion of its resources to schools and ethnic commemoration. Since the decency and respect criteria may not be employed in the very many instances in which the art seeking a subsidy is neither aimed at children nor meant to celebrate a particular culture, the statute is facially overbroad. Cf. *City of Lakewood, supra,* at 766 ("[I]n a host of . . . First Amendment cases we have . . . considered on the merits facial challenges to statutes or policies that embodied discrimination based on the content or viewpoint of expression, or vested officials with open-ended discretion that threatened the same, even where it was assumed that a properly drawn law could have greatly restricted or prohibited the manner of expression or circulation at issue"). Accordingly, the Court's observation that there are a handful of permissible applications of the decency and respect proviso, even if true, is irrelevant.[15]

---

[15] The Court seemingly concedes that these isolated constitutional applications are in fact of little matter. For after speaking of specific applications that may be valid, the Court goes on to admit that these "would not alone be sufficient to sustain the statute." *Ante,* at 585. The Court nonetheless upholds the statute because it is not "persuaded that, in other applications, the language of § 954(d)(1) itself will give rise to the suppression of protected expression." *Ibid.* This conclusion appears to rest on some combination of (a) the Court's competition rationale as distinguishing *Rosenberger* and justifying the discrimination, (b) the Court's reading of the decency and respect proviso as something other than viewpoint based, and (c) the Court's treatment of "taking into consideration" as establishing no firm mandate subject to constitutional scrutiny. As already explained,

The Government takes a different tack, arguing that over-breadth analysis is out of place in this case because the "prospect for 'chilling' expressive conduct," which forms the basis for the overbreadth doctrine, see, *e. g.*, *Massachusetts* v. *Oakes*, 491 U. S. 576, 584 (1989) (plurality opinion of O'CONNOR, J.), "is not present here." Brief for Petitioners 20–21, n. 5. But that is simply wrong. We have explained before that the prospect of a denial of government funding necessarily carries with it the potential to "chil[l] . . . individual thought and expression." *Rosenberger*, 515 U. S., at 835. In the world of NEA funding, this is so because the makers or exhibitors of potentially controversial art will either trim their work to avoid anything likely to offend, or refrain from seeking NEA funding altogether. Either way, to whatever extent NEA eligibility defines a national mainstream, the proviso will tend to create a timid esthetic. And either way, the proviso's viewpoint discrimination will "chill the expressive activity of [persons] not before the court." *Forsyth County, supra,* at 129. See App. 22–24 (declaration of Charlotte Murphy, Executive Director of respondent NAAO) (recounting how some NAAO members have not applied for NEA grants for fear that their work would be found indecent or disrespectful, while others have applied but were "chilled in their applications and in the scope of their projects" by the decency and respect provision). Indeed, because NEA grants are often matched by funds from private donors, the constraining impact of § 954(d)(1) is significantly magnified:

> "[T]he chilling effect caused by [the NEA's viewpoint-based selection criteria] is exacerbated by the practical realities of funding in the artistic community. Plainly stated, the NEA occupies a dominant and influential role in the financial affairs of the art world in the United

---

however, fair reading of the text and attention to case law foreclose reliance on any, let alone all, of these arguments.

States. Because the NEA provides much of its support with conditions that require matching or co-funding from private sources, the NEA's funding involvement in a project necessarily has a multiplier effect in the competitive market for funding of artistic endeavors. . . . [In addition,] most non-federal funding sources regard the NEA award as an imprimatur that signifies the recipient's artistic merit and value. NEA grants lend prestige and legitimacy to projects and are therefore critical to the ability of artists and companies to attract non-federal funding sources. Grant applicants rely on the NEA well beyond the dollar value of any particular grant." *Bella Lewitzky Dance Foundation* v. *Frohnmayer,* 754 F. Supp. 774, 783 (CD Cal. 1991) (footnote and internal quotation marks omitted).[16]

Since the decency and respect proviso of § 954(d)(1) is substantially overbroad and carries with it a significant power to chill artistic production and display, it should be struck down on its face.[17]

---

[16] See also, *e. g.,* 131 Cong. Rec. 24808 (1985) ("[S]upport from the Endowmen[t] has always represented a 'Good Housekeeping Seal' of approval which has helped grantees generate non-Federal dollars for projects and productions").

[17] I agree with the Court that § 954(d) is not unconstitutionally vague. Any chilling that results from imprecision in the drafting of standards (such as "artistic excellence and artistic merit") by which the Government awards scarce grants and scholarships is an inevitable and permissible consequence of distributing prizes on the basis of criteria dealing with a subject that defies exactness. The necessary imprecision of artistic-merit-based criteria justifies tolerating a degree of vagueness that might be intolerable when applying the First Amendment to attempts to regulate political discussion. Cf. *Arkansas Ed. Television Comm'n* v. *Forbes,* 523 U. S. 666, 694–695 (1998) (STEVENS, J., dissenting). My problem is not with the chilling that may naturally result from necessarily open standards; it is with the unacceptable chilling of "dangerous ideas," *Speiser* v. *Randall,* 357 U. S. 513, 519 (1958), that naturally results from explicitly viewpoint-based standards.

## V

The Court does not strike down the proviso, however. Instead, it preserves the irony of a statutory mandate to deny recognition to virtually any expression capable of causing offense in any quarter as the most recent manifestation of a scheme enacted to "create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." § 951(7).