**Patricia E. GENTALA and Robert A. Gentala, Plaintiffs,**

v.

**CITY OF TUCSON, Defendant.**

**No. CV–97–327–TUCFRZ.**

United States District Court, D. Arizona.

Nov. 10, 2003.

Jay Allen Sekulow, Virginia Beach, VA, David A. Cortman, Lawrenceville, GA, Benjamin W. Bull, Esq, Gary Stuart McCaleb, Scottsdale, AZ, for Plaintiffs.

Loretta Bridget Humphrey, Esq, Merle Joy Turchik, Esq, Dennis Patrick McLaughlin, Esq, Office of the Tucson City Attorney, Tucson, AZ, for Defendant.

## ORDER

ZAPATA, District Judge.

In its September 30, 1997 Order (the "original decision"), the Court concluded that Establishment Clause considerations justified the City of Tucson's (the City) policy of excluding events that are in direct support of religious organizations, such as the Gentalas' local National Day of Prayer event, from receiving funds from the City's Civic Events Fund. The Ninth Circuit Court of Appeals remanded this case with the mandate that the Court reconsider its original decision "in light of the Supreme Court's decision in *Good News Club v. Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), including such evidentiary proceedings as may be appropriate." *Gentala v. City of Tucson*, 275 F.3d 1160 (9th Cir. 2002).[1] This Order complies with that mandate.

---

1. A significant procedural history occurred between this Court's original decision and the Ninth Circuit's remand. First, a three-judge panel of the Ninth Circuit Court of Appeals partially reversed this Court's original decision. *Gentala v. City of Tucson*, 213 F.3d 1055 (9th Cir.2000). Then, the Ninth Circuit, sitting en banc, affirmed this Court's original decision. *Gentala v. City of Tucson*, 244 F.3d 1065 (9th Cir.2001). Thereafter, the Supreme Court granted certiorari, vacated the Ninth Circuit's judgment, and remanded the case to the Ninth Circuit for further consideration in light of *Good News Club. Gentala v. City of Tucson*, 534 U.S. 946, 122 S.Ct. 340, 151 L.Ed.2d 256 (2001). The Ninth Circuit then remanded the case to this Court for reconsid-

After the remand to this Court, the Gentalas submitted a "motion for preliminary injunction on remand," the City filed an opposition to that motion, and the Gentalas filed a reply. In their joint report submitted on May 24, 2002, the parties agreed that this briefing addressed the issues for reconsideration. The parties also conducted limited discovery and submitted additional evidence to the Court. After discovery was complete, each party submitted a supplemental memorandum of law and each party responded to the opposing party's supplemental memorandum. The Court heard oral argument on the issues for reconsideration on March 3, 2003. Since oral argument, the parties have submitted several notices of supplemental authority, which the Court has considered.

As explained more fully below, the Court concludes that the City violates the Free Speech Clause of the First Amendment when it excludes events held in direct support of religious organizations from Civic Events Fund support. The Court also concludes that Establishment Clause considerations do not justify the City's exclusion.

## Background

### A. The Civic Events Fund

The City charges a reservation fee to use certain park facilities. [Silva Aff. ¶ 5.] It also provides, for a mandatory fee, event equipment that can be used at park facilities by "civic, social, religious, charitable, commercial, or other users." [Ronstadt Aff. ¶¶ 4–9.]

The City, however, has developed a Civic Event Policy to

encourage and support Civic Events that: celebrate and commemorate the historical, cultural and ethnic heritage of the City and the nation, or increase the community's knowledge and understanding of critical issues, with the purpose of improving citizens' quality of life; generate broad community appeal and participation; instill civic pride in the City, state, or nation; contribute to tourism; or are identified as unique community events.

[P. Gentala Decl. Ex. A at 1.] To that end, the City provides support to civic events sponsored by nonprofit organizations and individuals by providing certain City services, such as event equipment, "at no charge." [P. Gentala Decl. Ex. A at 1.] This support does not result in the City making cash payments to the events or the sponsors. [P. Gentala Decl. Ex. A at 1.] Instead, the City provides "in-kind" support by having the City department that provides the service send its bill directly to the City's Civic Events Fund, rather than to the event sponsor. [Ronstadt Aff. ¶ 8; Bilsens Aff. ¶ 8.] The Civic Events Fund consists of money from the City's general fund, which includes "tax revenue." [Bilsens Aff. ¶¶ 4,6]

Under the Civic Event Policy, the City will only support events that satisfy certain threshold criteria. These threshold criteria include, among other things, that the event is not "held in direct support of religious organizations."[2] [P. Gentala Decl. Ex. A at 2.] According to the City's attorney, events that directly support a religious organization include "fundrais-

---

eration. *Gentala v. City of Tucson,* 275 F.3d 1160 (9th Cir.2002).

**2.** In addition, the City will not support events unless they are open to the public and do not discriminate against patrons in any manner; the sponsors maintain a financial accounting of the event, obtain liability insurance, and

contact a civic events coordinator to obtain assistance in coordinating the event; and the events are sponsored by non-profit organizations (or individuals conducting the events on a nonprofit basis) that do not receive outside agency funding from the City or use City property on a rent-waived basis. [P. Gentala Decl. Ex. A at 1–2.]

ers" and events with a "religious message." [Aug. 8, 1997 Hr'g on Mot. for Prelim. Inj. at 42–43.]

The City has the discretion to support an event that satisfies the threshold criteria. In deciding the level of support, if any, that it will provide, the City considers certain subjective criteria, such as the purposes and objectives of the event, the extent to which the event would generate broad community appeal and participation, the need for City support, and the extent to which sponsors have explored and obtained other sources of support. [P. Gentala Decl. Ex. A at 3.]

### B. The Gentalas and the Tucson National Day of Prayer Committee

Patricia Gentala chairs the non-profit Tucson National Day of Prayer Committee (the Prayer Committee), and she and her husband, Robert Gentala, are actively engaged in organizing local National Day of Prayer activities. [P. Gentala Decl. ¶¶ 2–3, 19; R. Gentala Decl. ¶¶ 2, 5.] The purpose of the Prayer Committee is to "organize an annual gathering of Tucson Christians" to observe the national and local Days of Prayer, [P. Gentala Decl. Ex. F at 3.]

In 1997, the Prayer Committee obtained permits from the City to hold a prayer event at the City's Bandshell. [P. Gentala Decl. ¶ 20.] More than 500 Tucson area churches and Christian ministries were invited to participate in the prayer event, which was to be open to the public and have no admission charge. [P. Gentala Decl. Ex. F at 2–3.] The decorations and music for the prayer event were designed to emphasize patriotism. [*Id.* at 3.] And participants were to be led in prayers for "local, state and national issues," including "[i]mproved relationships between different segments of our society[; n]ational, state and local leaders and their specific prayer requests[; l]aw enforcement and emergency services[; y]outh, families,

neighborhood and the homeless[;] and [e]ducators and schools." [*Id.*]

The Prayer Committee and its co-sponsor, the Tucson Association of Evangelicals, applied for Civic Events Fund support. [P. Gentala Decl. Ex. F at 1.] Specifically, the Prayer Committee sought support for $340 worth of City event equipment, including the use of inside facilities at the Bandshell and audio and lighting equipment operated by City employees. [P. Gentala Decl. Ex. F. at 7.] The Civic Event Subcommittee declined to fund the prayer event because it was "against [the] funding policy" and because, according to the chairperson of the Subcommittee, "[w]e're not gonna get into prayer stuff." [P. Gentala Decl. Ex. G.]

After the Mayor and City Council reviewed the application and considered a statement from Robert Gentala, the City denied funding because the event was "an event that supports a religious organization." [P. Gentala Decl. Exs. 1, J.]

Ultimately, the Prayer Committee's event took place at the Bandshell without support from the Civic Events Fund. [P. Gentala Decl. ¶ 20.]

### Discussion

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. amend. I. This case stands at the crossroads of the First Amendment's Free Speech and Establishment Clauses.

The Court begins with three unremarkable conclusions. First, the Prayer Committee was engaged in constitutionally protected speech. Second, the Bandshell at the park was a public forum. Finally, the City did not deprive the Prayer Committee

of the right to conduct its event at the Bandshell.

· Although these conclusions are unremarkable, the Court must answer three profoundly more difficult questions. First, is the Civic Events Fund a forum for purposes of the First Amendment or is traditional forum analysis inappropriate because the City is engaged in governmental speech? Second, does the City violate the Free Speech Clause when it excludes events held in direct support of religious organizations? Finally, do Establishment Clause considerations justify the City's policy of exclusion? As explained more fully below, the Court concludes that the Civic Events Fund is a forum, that the City violates the Free Speech Clause when it excludes events held in direct support of religious organizations from access to that forum, and that Establishment Clause considerations do not justify that exclusion.

At the outset, the Court notes that the City excluded the Gentalas' event from funding because of its religious message. At the August 8, 1997 hearing on the motion for preliminary injunction, the City's attorney stated that there were two ways that an event would directly support a religious organization: first, when the event was a fundraiser for a religious organization; and second, when the City endorsed a religious message. [Aug. 8, 1997 Hr'g on Mot. for Prelim. Inj. at 42–43.] Here, the City refused to consider the request because the Gentalas' event had a religious message. As the Civic Event Subcommittee's chairperson stated: "[w]e're not gonna get into prayer stuff." [P. Gentala Decl. Ex. G.] And, as the City's attorney stated: "[T]hat is what happened in this case. The council has said we are not going to endorse a religious message." [Aug. 8, 1997 Hr'g on Mot. for Prelim. Inj. at 43.] To the extent that the City now contends that it denied the Gentalas' application because the event included a free will offering that would have been used to defray the costs of the following year's event, that claim is not supported by the record. The fundraising argument is, at best, a post hoc justification for the City's decision. Accordingly, the Court will not address whether the City *could have* denied the Gentalas' application on that basis.

### A. The Civic Events Fund is a forum.

The Gentalas contend that the Civic Events Fund is a forum. The City, however, contends that the Civic Events Fund is not a forum because it was created "as a vehicle for City speech," not solely to encourage private speakers, and because the City is actually speaking when it selects which events it will fund. The Gentalas' argument is more persuasive.

"[V]iewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust* [*v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)], in which the government 'used private speakers to transmit specific information pertaining to its own program.'" *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 1048, 149 L.Ed.2d 63 (2001) (citations omitted) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 2519, 132 L.Ed.2d 700 (1995)). However, " '[i]t does not follow ... that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.'" *Id.* at 542, 121 S.Ct. at 1049 (quoting *Rosenberger*, 515 U.S. at 834, 115 S.Ct. at 2519). "Having offered to pay third-party contractors on behalf of private speakers who convey their own messages, the [government] may not silence the expression of selected viewpoints." *Rosenberger*, 515 U.S. at 835, 115 S.Ct. at 2519.

Here, the City is encouraging private speech, not transmitting its own message. In *Rosenberger*, the Supreme Court found that the University's student activity fund, which was established to "support a broad range of extracurricular student activities that 'are related to the educational purpose of the University,'" was a forum. 515 U.S. at 824, 830, 115 S.Ct. at 2514, 2517. Similarly, the City states in its Civic Event Policy that the purpose of the Fund is to "encourage and support Civic Events" by nonprofit individuals and organizations. [P. Gentala Decl. Ex. A at 1.] And the City supports a broad range of diverse events that fall within its general definition of civic events. [Pl. Supplemental Exhibits.]

In addition, the City is not speaking itself or using private speakers to convey the City's own message. The City is not responsible for and does not control the content of the speech at civic events to which it lends support. Nor does the City adopt the private speech. In fact, the City endeavors to ensure that events receiving Civic Events Fund support are *not* construed as City speech. In each approval letter sent to Civic Events Fund recipients, the City requests that it be cited as a "contributor" to the event, but specifically states: *"please do not identify the City of Tucson as a 'sponsor' or 'co-sponsor' to avoid any confusion about whether your event is a City of Tucson event."* [3] [Pl. Supplemental Ex. 10 at 13 (emphasis added).] This is similar to the declaration in *Rosenberger* that student groups eligible for funds were not subject to the University's control, were not the University's agents, and were not the University's responsibility. 515 U.S. at 834–35, 115 S.Ct. at 2519.

■ Therefore, the Court concludes that the Civic Events Fund is a forum for First Amendment purposes.

Moreover, *National Endowment for the Arts v. Finley*, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), is inapposite. In *Finley*, the artists were challenging the subsidy's subjective factors. Here, as in *Rosenberger*, the Gentalas are challenging an objective threshold requirement—that the event not be one that is "held in direct support of religious organizations."

In *Rosenberger*, the student organization challenged the *objective* threshold requirement that its activity not be a religious activity, not the subjective factors, such as "the size of the [student] group, its financial self-sufficiency, and the University-wide benefit of its activities," that the University considered in determining how much funding each student organization would receive. *Rosenberger*, 515 U.S. at 825, 827, 115 S.Ct. at 2515, 2516. In *Finley*, however, the artists challenged the National Endowment of the Arts ability to consider *subjective* factors in determining which projects to subsidize. 524 U.S. at 583, 118 S.Ct. at 2177. In distinguishing *Rosenberger* and *Lamb's Chapel*,[4] the Supreme Court in *Finley* noted that the National Endowment for the Arts was required to make "esthetic judgments" and consider subjective thresholds of artistic excellence. 524 U.S. at 586, 118 S.Ct. at 2178. In contrast, the Supreme Court explained that the subsidy in *Rosenberger* was available to all student organizations that were related to the educational purposes of the University and that the access to public facilities in cases such as *Lamb's Chapel* was based on "comparably objective decisions." *Id.*

---

3. The precise structure of the sentence varies only slightly between versions of the approval letter.

4. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

Here, the Gentalas are not challenging the City's ability to selectively support events based on subjective considerations.[5] Rather, they are challenging the City's ability to exclude events based on a threshold objective requirement—that the event not be one that is "held in direct support of religious organizations." They seek what the artists in *Finley* had already received—consideration based on subjective, religion-neutral factors.

## B. The City violates the Free Speech Clause.

■ The Court has concluded that the Civic Events Fund is a forum. However, the Court need not determine into which category of fora the Civic Events Fund falls. Even if the City is correct that the Civic Events Fund is a nonpublic forum, where the government is subject to the least amount of scrutiny, "the government violates the First Amendment when it denies access [to a nonpublic forum] to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985). Whether the Civic Events Fund was a nonpublic forum or a limited public forum, the City's restriction must be viewpoint neutral and reasonable in light of the purpose of the forum. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir.1999).

"[S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Good News Club*, 533 U.S. at 112, 121 S.Ct. at 2102. Thus, in determining whether the City's denial of access to the Civic Events Fund was based on viewpoint discrimination, the Court must first determine whether the subject matter of the Gentalas' event fits within the general subject matter of events that are eligible for support from the Civic Events Fund. If so, the Court must determine whether the City's decision to exclude the event was based on the fact that the subject matter was presented from a religious perspective.

First, the Gentalas' event deals with a subject matter otherwise permitted under the Civic Event Policy. The Civic Events Fund was created to encourage and support civic events that, among other things, instill civic pride, increase the community's knowledge and understanding of critical issues in order to improve citizens' quality of life, and celebrate the historical and cultural heritage of the nation. [P. Gentala Decl. Ex. A at 1.] The Gentalas stated in their Civic Events Fund application that their event would emphasize patriotism in its music and decorations, that youth and adult choirs would sing, and that participants would be led in prayers for "local, state and national issues" such as: improved relations between different segments of society, schools and educators, government leadership, families and children, neighborhoods, law enforcement, and the homeless. [P. Gentala Decl. Ex. F at 3.] The event clearly dealt with a subject matter otherwise permitted under the Civic Event Policy.[6]

---

**5.** In determining whether, and how much, support the City will provide to an event that passes its objective threshold requirements, the City considers the extent to which the event: "celebrates and commemorates the community's cultural and ethnic composition"; "improves understanding and awareness of issues facing the community";

"generates broad community appeal and participation"; "demonstrates a need for the City support"; and "has explored and obtained other sources of support." [P. Gentala Decl. Ex. A. at 3.]

**6.** The Gentalas' event is at least similar in subject matter to the Tucson Martin Luther

The City denied the Gentalas' application, however, because the Prayer Committee chose to foster civic pride and address critical issues, such as improved community relations, homelessness, education, and law enforcement, from a religious, rather than a secular, perspective. The City denied the application because it involved "prayer stuff." [P. Gentala Decl. Ex. G.] The Supreme Court and the Ninth Circuit have clearly concluded that exclusion on this basis constitutes impermissible viewpoint discrimination. *See Good News Club*, 533 U.S. at 112, 121 S.Ct. at 2102; *Rosenberger*, 515 U.S. at 829–32, 115 S.Ct. at 2516–18; *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393–94, 113 S.Ct. 2141, 2147–48, 124 L.Ed.2d 352 (1993); *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1052 (9th Cir.2003); *Prince v. Jacoby*, 303 F.3d 1074, 1091–92 (9th Cir.2002), *cert. denied*, —— U.S. ——, 124 S.Ct. 62, 157 L.Ed.2d 27 (2003).

The City contends, however, that it does not categorically exclude events with a religious subject matter or viewpoint. This is true. The City supported the Las Posadas festival, an event that re-creates "Mary and Joseph's search for lodging prior to the birth of Jesus." [P. Gentala Decl. Ex. C at 2.] The City supported La Reunion de el Fuerte, an event that "celebrates the historical, cultural and ethnic heritage of the Old Fort Lowell Area" and includes a "historic mass celebration." [Pl.

Supplemental Ex. 61 at 22.] And the City supported the Yaqui Easter Ceremonies, an event that includes "Processions of the 14 stations of the Cross and Prayers of Devotion and all night vigils to our Lord Jesus Christ." [7] [Pl. Supplemental Ex. 115 at 11.]

■ However, the fact that the City does not categorically exclude events with a religious subject matter or viewpoint does not aid the City. The City is still engaged in viewpoint discrimination. Under the City's application of its Civic Events Policy, a religious organization can receive Civic Events Fund support as long as it does not provide a religious perspective on an otherwise includible subject—it could hold an event encouraging world peace and cultural unity through reggae music, but not through prayer. Moreover, the City's application of its policy precludes eligibility for *religious* organizations that engage in religious prayer ceremonies, but permits eligibility for *nonreligious* organizations that engage in identical religious prayer ceremonies (historical masses and prayers of devotion to Jesus Christ). It is unclear how such a distinction is "reasonable" in light of the purpose of the forum—encouraging and supporting civic events. *See Rosenberger*, 515 U.S. at 828, 115 S.Ct. at 2516 ("In the realm of private speech or expression, government regula-

King Jr. Celebration, which received Civic Events Fund support. [Pl. Supplemental Ex. 66.] The Tucson Martin Luther King Jr. Celebration's sponsor stated in its Civic Events Fund applications that the event would feature gospel music, songs, cultural dance, and public speaking, and that the event had the goal of celebrating cultural diversity and creating community awareness of the "need [for] respect and tolerance of our differences." [*Id.* at 2, 37, 67.] Similarly, the City supported the Bob Marley Festival, which, during some years, encouraged world peace, concern

for the environment, and cultural diversity through reggae music. [Pl. Supplemental Ex. 19 at 2.]

7. The mayor stated that "[I]t is my belief that Native American religion and culture is an important and special part of the larger Tucson community throughout the year. This is especially true of the Yaqui religion during the Lenten season when everyone is invited to learn about and observe your ceremonies." [Pl. Supplemental Ex. 115 at 12.]

tion may not favor one speaker over another.").

Thus, the Court concludes that the City violates the Free Speech Clause when it excludes events, such as the Gentalas', on the basis that they are events "held in direct support of religious organizations."

### C. The Establishment Clause does not justify the exclusion.

■ In its original decision, the Court agreed with the City's argument that its discrimination against events held in direct support of religious organizations was necessary to avoid violating the Establishment Clause. Upon reconsideration, the Court rejects that argument.[8]

■ First, the City's policy is not neutral towards religion; the Civic Events Fund excludes events that directly support religious organizations. As in *Good News Club*, the Gentalas "seek[ ] nothing more than to be treated neutrally and given access to speak about the same topics as are other groups." *Good News Club*, 533 U.S. at 114, 121 S.Ct. at 2104. Although not determinative, neutrality toward religion is a significant factor in upholding a government program against an Establishment Clause attack. *See id.* at 114, 121 S.Ct. at 2104; *Rosenberger*, 515 U.S. at 839, 115 S.Ct. at 2521.

It would "ensure neutrality, not threaten it," *Good News Club*, 533 U.S. at 114, 121 S.Ct. at 2104, if events that "directly support religious organizations" and those that do not were eligible to receive Civic Events Fund support. Thus, the City faces an "uphill battle" to demonstrate that the Establishment Clause compels it to exclude events that directly support religious organizations. *Id.*

In undertaking this battle, the City wages a three-pronged offensive. It contends that providing Civic Events Fund support for events that directly support religious organizations would foster excessive governmental entanglement with religion, would be perceived as an endorsement of religion, and would be subsidizing religious activity. None of these arguments is victorious.

### 1. Entanglement

The City argues that its policy of excluding events that directly support religious organizations does not create impermissible entanglement with religion because it is a "bright-line policy" that avoids potential inconsistencies that might arise if the City had to examine the content of each event. But the City's policy fosters, rather than avoids, entanglement.

Under its policy, the City must scrutinize applicants' speech to decide whether an event directly supports a religious organization. The City had to examine the content of the Gentalas' event to determine that it directly supported a religious organization because it had a religious message. And it had to examine the content of the Shriners' Family Fair Weekend to determine that it did not. [Pl. Supplemental Ex. 85.] That event was sponsored by the Shriners (Tucson Temple), an organization that stated in its Civic Events Fund application that it required its members to pledge a specific religious belief and that it would terminate an individual's membership if the individual would not make such a pledge. [*Id.* at 4.] Moreover, the event was raising funds for Shriners' Hospitals. [*Id.* at 2.] Likewise, the City had to exam-

---

8. In *Good News Club*, the Supreme Court stated that "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." 533 U.S. at 113, 121 S.Ct. at 2103.

But, as was the case in *Good News Club*, the Court need not resolve this issue because the City's Establishment Clause defense fails. *See id.*

ine the contents of Las Posadas (an event re-creating Mary and Joseph's search for lodging prior to the birth of Jesus), La Reunion de el Fuerte (an event including a religious mass), and the Yaqui's Easter Ceremonies (an event including "[p]rocessions of the 14 stations of the Cross and Prayers of Devotion and all night vigils to our Lord Jesus Christ"), to determine that they did not *directly* support religion. Thus, the City's policy of excluding events that directly support religious organizations requires, rather than avoids, excessive entanglement with religion. *See Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 2373, 110 L.Ed.2d 191 (1990) ("[A] denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur."); *Widmar v. Vincent,* 454 U.S. 263, 272 n. 11, 102 S.Ct. 269, 275 n. 11, 70 L.Ed.2d 440 (1981)("[T]he University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech.'"); *Kreisner v. City of San Diego,* 1 F.3d 775, 789 (9th Cir.1993) ("In fact, the danger of entanglement would be considerably greater if the City screened the religious motives of speakers before allowing them access to Balboa Park.").

### 2. Endorsement

The Ninth Circuit, sitting en banc, concluded that the "Civic Events Fund program is *meant* to endorse some events as 'Civic Events' worthy of the City's imprimatur." *Gentala,* 244 F.3d at 1080. It does not necessary follow, however, that subsidizing events that directly support religious organizations would be perceived as an endorsement of religion. When determining whether government support would constitute endorsement of religion, the Court must consider "whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement [of religion]." *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 308, 120 S.Ct. 2266, 2278, 147 L.Ed.2d 295 (2000) (quoting *Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 2500, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment)). In so doing, the Court considers several factors that the parties, the Court, and the Ninth Circuit found relevant to the endorsement issue.

#### a. City Employees and Equipment

In the Court's original decision, the Court noted that observers might perceive endorsement because they would see City employees operating City-owned lights and audio equipment at a religious event. *See also Gentala,* 244 F.3d at 1079 (en banc) ("[T]he subsidy often includes ... the on-site, observable presence of city employees .... Moreover, the equipment used—microphones, lighting systems, tables, public address systems—is city owned and likely to be quite visible to onlookers during the event."). Upon reconsideration, the Court no longer agrees with this position. Regardless of whether an event pays for those services, or receives Civic Events Fund support for them, the same employees and equipment would be present.

Likewise, the Ninth Circuit, sitting on banc, concluded that there is some evidence of endorsement because "organizers of funded events are directed to deal with a city official denominated the 'Civic Event Coordinator' in order to 'obtain assistance in coordinating the event.'" *Gentala,* 244 F.3d at 1080. However, the supplemental information provided to the Court on remand indicates that *all* events are required to deal with the Civic Event Coordinator to obtain assistance coordinating events,

**1022**

regardless of whether the event receives Civic Events Fund support.[9]

Thus, an objective observer, aware of this information, could not reasonably perceive endorsement of religion from the presence of City employees and equipment or from coordination with the City's Civic Event Coordinator.

#### b. Acknowledgment Requirement

In the original decision, the Court was not persuaded by the City's suggestion that endorsement was inevitable because the City states in its Civic Events Fund application that events must agree to "acknowledge through event advertising and an announcement during [the] event that the City has contributed services to the event." [P. Gentala Decl. Ex. F at 1.] The Court concluded that the City could just as easily advertise that it does not endorse events.[10]

The Court is still not persuaded that an objective observer would perceive endorsement based on the City's "acknowledgment" requirement. First, a "mistaken inference of endorsement is largely self-imposed, because the [defendant] itself has control over any impressions it gives to [observers]." *Prince*, 303 F.3d at 1094 (quoting *Mergens*, 496 U.S. at 251, 110 S.Ct. at 2372). The Court, therefore, continues to believe that the City can dispel

any "mistaken inference of endorsement" by making it clear to observers that it does not endorse events it supports on a religiously nondiscriminatory basis. *See Mergens; Prince.*

Second, although the Civic Events Fund application states that events must agree to acknowledge the City's support, the City, in practice, does not mandate such an acknowledgment. To the contrary, the City specifically states in letters approving Civic Events Fund support that the City

would *appreciate* that [the event] cite the City of Tucson as a "contributor" to the event, either as a part of your event advertising or through an announcement during the event. *However, please do not identify the City of Tucson as a "sponsor" or "co-sponsor" to avoid any confusion about whether your event is a City of Tucson event.*

[Pl. Supplemental Ex. 10 at 13 (emphasis added).] The City, therefore, does not mandate an acknowledgment and actually attempts to avoid a perception of endorsement. An objective observer, aware that the City does not actually require acknowledgment and actively seeks to avoid confusion about sponsorship of the event and its message, could not reasonably perceive endorsement of religion based on the City's "acknowledgment" requirement.

---

9. The most recent version of the Civic Events Fund application states:

> You must contact Officer Rosemarie Cowan, Tucson Police Civic Events Coordinator, 791–4058, at least 60 days before your event to receive assistance in acquiring city permits, obtaining necessary inspections, and arranging for fee-waived or paid City services to be provided. *This is regardless of the outcome of your request for fee waivers through the civic event funding process (application for civic event support).*

[Pl. Supplemental Ex. 10 at 2 (Mar. 30, 2001 version) (emphasis added).] Prior versions of the application also indicated that dealing

with the Civic Event Coordinator was required "regardless of the outcome of your request for fee waivers." [Pl. Supplemental Ex. 11 at 2 (Apr. 18, 2000 version); Ex. 12 at 2 (Apr. 30, 1996 version); Ex. 5 at 1 (Oct. 8, 1992 version).]

10. The Ninth Circuit, sitting en banc, disagreed with that conclusion, noting that "courts are not in the business of designing governmental programs but, instead, of taking them as they find them and determining their constitutional significance." *Gentala*, 244 F.3d at 1080.

### c. City Selection Process

The City also contends that observers will perceive endorsement because the City reviews applications and selects "a narrow range of civic events it has determined espouse the City's Civic Event Policy." The Ninth Circuit, sitting en banc, agreed, stating that "the detailed, subjective funding criteria . . ., as well as the role of the Mayor and Council in establishing and applying those criteria, would contribute to an informed observer's impression that an event that survives the review process is one that the City affirmatively endorses." *Gentala*, 244 F.3d at 1079.

The City, in some respects, endorses an event when it applies its subjective criteria and selects an event for funding. However, the Court does not believe that the City's selection of an event that directly supports religious organizations would result in an objective observer perceiving this "endorsement" to be an endorsement of religion.

First, the City's selection process leads to the funding of virtually every event, not a "narrow range" of events. Of the 116 events that applied for Civic Events funding from the 1996–1997 fiscal year to the 2001–2002 fiscal year, 112 events satisfied the threshold conditions for receiving support.[11] [Bull Decl. ¶ 21; Pl. Supplemental Exhibits.] Of those 112 events, the City funded 108 events based on its subjective, religion-neutral criteria. This suggests that the City's review was minimal and its approval routine. Aware of this, an objective observer would not perceive endorsement of religion.

Second, if the City subsidized an event held in direct support of a religious organization, it would not be doing so in a vacu-

um. The City subsidizes a wide variety of events that meet its subjective, but religion-neutral, criteria. Among the 108 events the City funded are: a celebration of the musical messages of Bob Marley, athletic tournaments, musical concerts and festivals, holiday parties and parades, historical events and festivals, corn festivals, a police K–9 unit competition, gay rodeos and rodeos without reference to sexual orientation, a breast cancer awareness event, and a variety of fundraisers, including beer festivals, Jell–O wrestling, pancake breakfasts, Christmas tree sales, and mini-Indy car races. [Pl. Supplemental Exhibits.] Funding such a diverse mix of events significantly diminishes the likelihood that an objective observer would perceive financial support of an event with a religious message as an endorsement of religion, as opposed an endorsement of a civic event that satisfies religion-neutral criteria. *Cf. Rosenberger*, 515 U.S. at 850, 115 S.Ct. at 2527 (O'Connor, J., concurring) ("The widely divergent viewpoints of these many purveyors of opinion, all supported on an equal basis by the University, significantly diminishes the danger that the message of any one publication is perceived as endorsed by the University.").

### d. Conclusion

The Court has reconsidered whether allowing events that directly support religious organizations to be eligible for Civic Events Fund support would be perceived as an endorsement of religion. The Court believes that an objective observer, familiar with the Civic Event Policy and its implementation, would not perceive the receipt of in-kind benefits as an endorsement of religion by the City.

---

11. The four events that did not satisfy the City's threshold conditions were the Gentalas' event (supported a religious organization), Food Fest '97 (benefited for-profit organization); Fun Day in the Park (received funding from Outside Agency process); and Tucson P.B.A. Open (not a non-profit event). [Pl. Supplemental Ex. 3 at last page, Ex. 4 at last page, Ex. 5 at last page, and Ex. 8 at last page.]

### 3. Subsidizing Religious Activity

■ In its original decision, the Court concluded that the First Amendment precluded "an extraordinary expenditure taken from public taxes and spent in direct support of a religious group." Upon reconsideration, the Court no longer believes this conclusion applies.

First, the City is not providing a direct payment to an organization when it subsidizes an event. The Civic Event Policy states that "City support provided through the Civic Event process will not involve cash payments to events, or to contractors necessary to provide a requested service." [P. Gentala Decl. Ex. A at 1.] The City reiterates this in its letters approving Civic Events Fund support. [Pl. Supplemental Ex. 11 at 13.] The City provides support by having the City department that provides the service send its bill to the Civic Events Fund for payment. [Ronstadt Aff. ¶ 8; Bilsens Aff. ¶ 8.] Thus, as was the case in *Rosenberger* and *Prince,* the City is not making a direct payment to a group or organization that is engaged in religious activity. *See Rosenberger,* 515 U.S. at 842, 115 S.Ct. at 2523 ("Even assuming that [the student organization] is no different from a church and that its speech is the same as the religious exercises conducted in *Widmar* [,] . . . [w]e do not confront a case where . . . the government is making direct money payments to an institution or group that is engaged in religious activity."); *Prince,* 303 F.3d at 1092 ("Providing meeting space . . ., school supplies and bus transportation is not a direct payment to the [student club's] coffers, even though it may facilitate [its] own religious speech.")

Second, the proper focus is not on the governmental expenditure of funds; it is on the nature of the benefit received. *See Rosenberger,* 515 U.S. at 843, 115 S.Ct. at 2523 ("The error made by the Court of Appeals, as well as by the dissent, lies in focusing on the money that is undoubtedly expended by the government, rather than on the nature of the benefit received by the recipient."). Here, the City is providing secular services—booths, audio equipment, lighting, and refuse containers—for a secular purpose.[12] Similarly, the Supreme Court in *Rosenberger* concluded that printing services were a secular benefit and, even if an organization used those services to print speech with a religious content or viewpoint, "[a]ny benefit to religion is incidental to the government's provision of secular services for secular purposes on a religion-neutral basis." 515 U.S. at 843–44, 115 S.Ct. at 2524. As the Supreme Court noted, "[i]f the expenditure of government funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then *Widmar, Mergens,* and *Lamb's Chapel* would have to be overruled." *Id.* at 843, 115 S.Ct. at 2523.

The Ninth Circuit reached the same conclusion in *Prince.* There, the Ninth Circuit found that school supplies, audio/visual equipment, and school vehicles for fieldtrips were secular benefits. *Prince,* 303 F.3d at 1094. The Ninth Circuit concluded that, even if access to these services facilitated a student organization's religious speech, access to these services on a neutral basis would not result in the direct funding of religious organizations. *Id.* Instead, "[a]s in *Rosenberger,* it would simply require providing equal access to a 'service' that happens to be paid for by public funds." *Id.*

Finally, the fact that the Civic Events Fund consists of public funds does not

---

**12.** As the Court noted in its original decision, the Civic Event Policy has a secular purpose—promoting events that instill civic pride, contribute to tourism, and celebrate the historical, cultural, and ethnic heritage of the City and the nation.

alter this conclusion. *See id.* at 1093 ("That the provision of school supplies and school vehicles in this case involves public, rather than [student body], funds does not change our consideration.").[13]

The Court has reconsidered whether the City would be subsidizing religion if it permitted events that directly support religious organizations to be eligible for Civic Events Fund support. The Court concludes that there would be no unconstitutional subsidization of religion because the City would be providing in-kind support, not a direct payment, to religious organizations, and any benefit to religion would be an incidental effect of the City providing secular services for secular purposes on a religion-neutral basis.

### Conclusion

In compliance with the Ninth Circuit's mandate, the Court has reconsidered its original decision in light of *Good News Club*, other relevant Supreme Court and Ninth Circuit opinions, the submitted evidence, and the parties' arguments. The Court concludes that the City violates the Free Speech Clause of the First Amendment when it excludes events held in direct support of religious organizations from Civic Events Fund eligibility. Establishment Clause considerations do not justify that exclusion.

In light of this conclusion, the Gentalas are entitled to declaratory judgment in their favor.[14] The Court will deny without prejudice the Gentalas' request for a permanent injunction because the parties have not adequately addressed this issue. *See G.C. & K.B. Investments, Inc. v. Wilson,* 326 F.3d 1096, 1107 (9th Cir.2003) ("The requirements for the issuance of a permanent injunction are (1) the likelihood of substantial and immediate irreparable injury, and (2) *the inadequacy of remedies at law.*") (emphasis added).

Accordingly,

**IT IS ORDERED** that the City of Tucson's policy of precluding events "held in direct support of religious organizations" from receiving Civic Events Fund support is **DECLARED INVALID AND UNCONSTITUTIONAL** because it violates the Free Speech Clause of the First Amendment to the United States Constitution and is not justified by First Amendment Establishment Clause considerations.

13. The City attempts to distinguish *Prince* by claiming that "[f]or the most part," *Prince* "involved non-public funding," whereas "public tax dollars are at issue here." The City's argument is misplaced. Although a portion of *Prince* involved non-public funds, the Ninth Circuit *did* consider the expenditure of public funds. *See Prince,* 303 F.3d at 1090 ("Unlike access to the fundraising activities and the yearbook, *use of school supplies, AV equipment and school vehicles does involve the 'expend[iture of] public funds' because School District funds, rather than [student body funds], are used to purchase and maintain the equipment,"*) (emphasis added). And the Ninth Circuit specifically addressed that issue. *See id.* at 1093 ("That the provision of school supplies and school vehicles in this case involves *public,* rather than [student body], funds does not change our consideration.") (emphasis added).

14. In its original decision, the Court granted the Gentalas' motion to consolidate the hearing on the motion for preliminary injunction with the trial on the merits. The parties did not challenge that ruling on appeal and have not addressed that issue in this remand.